STATE OF NEBRASKA, APPELLEE, V. JOSEPH WALTER BROWN, SR.,
APPELLANT.

405 N.W.2d 600

Filed May 15, 1987.   No. 86-657.

John F. Steinheider of Hoch & Steinheider, for appellant.

Robert M. Spire, Attorney General, and Bernard L. Packett, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

Joseph Walter Brown, Sr., appeals the verdict and sentence in the district court for Otoe County regarding Brown's conviction for first degree sexual assault. We affirm.

The information charged that Brown, as one more than 19 years of age, had sexually penetrated a person less than 16 years of age, a violation of Neb. Rev. Stat. § 28-319(1)(c) (Reissue 1985). As a definitional section for the statutes pertaining to sexual assault, Neb. Rev. Stat. § 28-318(6) (Reissue 1985) provides in part: "Sexual penetration shall mean sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body . . . ."

BASIS OF CRIMINAL CHARGE

On February 2, 1985, the victim's mother, who is Brown's daughter, left the victim, 9 years of age, and the victim's 8-year-old sister with Brown, the children's apparently divorced 62-year-old grandfather, at his trailer house in Nebraska City. During that day, the two sisters played with friends outside Brown's trailer until suppertime, when the playmates returned to their homes. After supper, the victim, with her sister and grandfather, watched television in the living room of the trailer house. While watching "Creature Feature," the victim's sister fell asleep. As related in the victim's testimony, the following occurred:

Q [deputy county attorney]- Okay. What happened after [your sister] fell asleep?

A [victim]- Grandpa picked me up and took me into the bedroom.

Q- And what happened after you got to the bedroom?

A- He laid me down, took off my jeans and underpants.

Q- What else did he do?

. . . .

A- And then he started kissing and licking me between the legs.

. . . .

Q- Okay. What was he kissing you with — or what was he licking you with?

A- His tongue.

Q- Did he lick you in any particular spot?

A- Between my legs.

Q- Did you feel any pains when he did this?

A- Well, he tried to enter me with his tongue.

Q- And what happened?

A- He couldn't do it.

Q- Why couldn't he do it?

A- I was too small.

With anatomically illustrative dolls utilized during her testimony, the victim pointed to an area of the doll corresponding with the vaginal area of a human and indicated that Brown had placed his tongue on such area of the victim's body. (Somewhere, somehow, the phrase "anatomically correct" has crept into the legal lexicon in sexual assault cases, referring to a doll as a trial aid used in conjunction with a victim's testimony. We believe the more accurate characterization of such doll may be "anatomically illustrative," inasmuch as the doll used may not be a readily acceptable standard of correctness in the portrayal of human anatomy or an actually accurate representation of the genders.) Later, pursuant to her grandfather's instruction, the victim went into the bathroom, dressed herself, and returned to the living room, where she fell asleep next to her sister, who was still asleep.

On the morning of February 3, Brown returned the victim and her sister to their home. That afternoon the victim complained to her mother about a burning sensation when the victim urinated, but did not implicate her grandfather, because, as the victim explained: "I was too scared. I — I thought Grandpa might get in trouble." Approximately 2 weeks later, when she could no longer contain herself, the victim disclosed the incident to her mother, who immediately contacted Investigator Dan Scott of the Nebraska State Patrol. Scott interviewed the victim and her mother at their residence on February 18, and the victim told Scott about the sexual incident at Brown's trailer. Immediately after interviewing the victim and her mother, Scott attempted to contact Brown, but was unsuccessful.

## INTERVIEW OF BROWN

On February 19, Scott came to Brown's trailer to discuss the victim's allegations and knocked on the trailer's door. When Brown answered the door, Scott stated he "needed to talk to [Brown]" and asked to enter the trailer house, where Brown was alone. Scott was dressed in civilian attire rather than a trooper's uniform, and displayed his state trooper's badge to Brown, who, on account of a previous contact, knew that Scott was a police officer. Brown invited Scott into the living room of the trailer house, where Scott informed Brown that the victim-granddaughter had made "some accusations" against Brown which necessitated Scott's interviewing Brown, who was reminded that Scott was a police officer. Scott assured Brown that he was not under arrest and that he could cease talking with Scott at any time, admonishing Brown that "anything [Brown] told me could be used against [Brown] in court." Scott did not inform Brown of the latter's right to remain silent or the right to consultation with and presence of a lawyer during any discussion about the alleged sexual incident. Scott told Brown that the victim had indicated there was "some inappropriate sexual contact" between Brown and his granddaughter, and Brown responded: "I guess I went too far." When Scott sought an explanation concerning Brown's response, Brown admitted accompanying the victim into the bedroom of the trailer house, placing her on a bed, disrobing the victim, and placing his tongue between the victim's legs. Scott asked whether Brown knew the meaning of the word *vagina* and whether the vaginal area was the anatomical location where Brown had placed his tongue on the victim's body. Brown gave answers in the affirmative to each of Scott's inquiries. Throughout the interview, Scott made no promise or threat regarding any of Brown's unrecorded statements, and Brown neither requested that Scott leave the trailer nor attempted to terminate the conversation or request a lawyer. Nothing indicates that Brown was unable to leave his trailer house or otherwise depart from the presence of Investigator Scott.

## MOTION TO SUPPRESS

Brown moved to suppress his oral statements made to Investigator Scott during the interview at Brown's trailer,

asserting that Brown's incriminating statements were "coerced by threats and promises of leniency" and were "given without [Brown's] having been informed of his constitutional rights." At the suppression hearing, the State's evidence consisted of the officer's account of the interview in Brown's trailer, as detailed above. Brown did not offer evidence regarding his motion to suppress. The court overruled Brown's motion to suppress and expressed "there was no requirement that the Miranda Rights be administered before questioning . . . [because] the Court . . . finds that the statements were made in a non-custodial setting . . . ."

### TRIAL AND INSTRUCTIONS

At trial, Brown objected to admission of his incriminating statements as evidence offered by the State. At the conclusion of the State's case in chief, which consisted of evidence from the victim, the victim's mother, and Investigator Scott, as previously reflected in this opinion, Brown moved for dismissal of the charge against him or for a directed verdict of acquittal, alleging insufficiency of evidence to support the charge of first degree sexual assault. The court overruled Brown's motion.

Brown testified on his own behalf and denied making the incriminating statements to Investigator Scott. Further, while testifying, Brown denied all sexual contact with his granddaughter-victim and claimed that Investigator Scott "shaked his finger at me telling me that I did this." At the conclusion of his evidence, Brown renewed his motion for dismissal or directed acquittal, which the court overruled. At the conference regarding instruction of the jury, Brown requested an instruction on sexual assault of a child, conduct prohibited by Neb. Rev. Stat. § 28-320.01 (Reissue 1985): "A person commits sexual assault of a child if he or she subjects another person fourteen years of age or younger to sexual contact and the actor is at least nineteen years of age or older." Section 28-318(5) provides:

> Sexual contact shall mean the intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts. Sexual contact shall also mean the touching by the victim of the

actor's sexual or intimate parts or the clothing covering the immediate area of the actor's sexual or intimate parts when such touching is intentionally caused by the actor. Sexual contact shall include only such conduct which can be reasonably construed as being for the purpose of sexual arousal or gratification of either party.

The court refused to instruct on sexual assault of a child, § 28-320.01, and instructed the jury on the first degree sexual assault charge, § 28-319(1)(c), the charge on which the jury eventually found Brown guilty. Also, the court properly instructed the jury to determine whether Brown's statements to Investigator Scott were voluntary. See *State v. Bodtke*, 219 Neb. 504, 363 N.W.2d 917 (1985). The district court entered judgment on the verdict and sentenced Brown to imprisonment for 3 years.

Brown alleges the district court committed error in (1) failure to suppress Brown's incriminating statements made to Investigator Scott; (2) failure to dismiss the proceedings at the close of the State's case in chief and at the conclusion of all evidence; (3) failure to submit Brown's proposed instruction on sexual assault of a child as a lesser-included offense in first degree sexual assault; and (4) imposition of an excessive sentence.

## BROWN'S INCRIMINATING STATEMENTS

We first address Brown's assignment of error concerning the district court's failure to suppress Brown's statements made to Investigator Scott. In determining the correctness of a trial court's ruling on a motion to suppress, the Supreme Court will uphold a trial court's findings of fact unless those findings are clearly incorrect. *State v. Copple*, 224 Neb. 672, 401 N.W.2d 141 (1987); *State v. Dixon*, 222 Neb. 787, 387 N.W.2d 682 (1986). Because Investigator Scott did not inform Brown concerning the right to remain silent and the right to a lawyer, Brown did not receive the admonition required by the *Miranda* warning. See *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). As we expressed in *State v. Norfolk*, 221 Neb. 810, 814-15, 381 N.W.2d 120, 125 (1986):

Before a defendant's custodial statement is admissible as evidence, the absolute and indispensable prerequisites

of the *Miranda* warning must have been satisfied preceding the interrogation producing such statement, namely, law enforcement personnel must (1) inform the defendant of the right to remain silent, (2) explain that anything said can and will be used against the defendant in court, and (3) inform the defendant of the right to consult with a lawyer and to have a lawyer present during interrogation. *Miranda v. Arizona, supra.* If a defendant to be interrogated is indigent, the defendant must also be informed that a lawyer will be appointed to represent the defendant. *Miranda v. Arizona, supra.*

In *State v. Bodtke, supra* at 508-09, 363 N.W.2d at 921 (1986), we noted:

> *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), formulated prerequisites for admissibility of a suspect's in-custody statement(s) obtained "in a police-dominated atmosphere, resulting in self-incriminating statements," *id.* at 445, and sought to minimize the psychological advantage frequently inherent in an exercise of governmental authority as a tool for coercion, that is, the "potentiality for compulsion." *Id.* at 457. "Custodial interrogation" has been characterized by the U.S. Supreme Court in *Miranda* as "questioning instigated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444.

See *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977) (*"Miranda* warnings are required only when there has been a restriction on a person's freedom as to render him 'in custody' "). See, also, *State v. Bowersmith*, 224 Neb. 6, 9, 395 N.W.2d 527, 529 (1986) ("[T]he ultimate inquiry regarding the custodial status of a suspect ' "is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." ' "). Whether a person is in custody, in a constitutional sense, is a question of fact to be determined by the trial court. *State v. Bowersmith, supra.*

For suppression of his incriminating statements, Brown suggests that the *Miranda* warning was required, since the

investigation into the victim's accusations was "no longer a general inquiry into an unsolved crime" but had begun to "focus" on Brown as a suspect.

In *Beckwith v. United States*, 425 U.S. 341, 96 S. Ct. 1612, 48 L. Ed. 2d 1 (1976), agents of the Internal Revenue Service called on Beckwith at his home to investigate a possible criminal violation of laws governing federal income taxation. After the callers had identified themselves as Internal Revenue agents, Beckwith invited the investigators into the dining room of his residence, where the agents presented their credentials and told Beckwith they were investigating the possibility of fraud regarding Beckwith's tax liability. The agents informed Beckwith of his right to a lawyer before answering questions and admonished Beckwith that "anything which you say and any information which you submit may be used against you in any criminal proceeding." 425 U.S. at 343. Although Beckwith sought suppression of his statements to agents, the U.S. Supreme Court found that the statements were made in a "noncustodial" setting and stated:

> Although the "focus" of an investigation may indeed have been on Beckwith at the time of the interview in the sense that it was his tax liability which was under scrutiny, he hardly found himself in the custodial situation described by the *Miranda* Court as the basis for its holding. *Miranda* implicitly defined "focus," for its purposes, as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." [Citation omitted.]

(Emphasis omitted.) 425 U.S. at 347. See *Minnesota v. Murphy*, 465 U.S. 420, 431, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984) ("The mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings").

Regarding suppression of Brown's incriminating statements, the crucial question is whether Brown was in custody at the time he made those statements to Investigator Scott.

Some factors used to distinguish "custodial" from "noncustodial" statements were examined in *United States v.*

*Jones*, 630 F.2d 613 (8th Cir. 1980). In *Jones*, two FBI agents interviewed Jones in her home concerning her possible role in an embezzlement. Before questioning Jones, the FBI agents identified themselves, informed Jones that she was not under arrest, and told Jones she was free to refuse to answer any questions. In finding that Jones was not in custody and that the *Miranda* warning was, therefore, not required, the court pointed to several features of a "noncustodial" setting:

> The place where an interrogation takes place does not conclusively establish the presence or absence of custody. A deprivation of freedom may take place at one's home as well as at the police station. *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). By the same token, an interrogation at the police station may be noncustodial. *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Iverson v. North Dakota*, 480 F.2d 414, 423 n.10 (8th Cir. 1973). Determining if there has been a deprivation of freedom entails something more than simply identifying the place of interrogation.
>
> . . . .
>
> . . . [I]t becomes apparent that the interrogation of Jones was not custodial. We start with the fact that prior to any questioning Jones was informed that she was not under arrest and that she need not answer any questions. . . . The absence of a formal arrest and the advice of freedom to decline to answer, while not conclusive, are indicative of noncustodial interrogation. See *Oregon v. Mathiason*, 429 U.S. at 493, 97 S.Ct. at 713; *Beckwith v. United States*, 425 U.S. at 343, 96 S.Ct. at 1614; [citations omitted].

It should not be understood, however, that the absence of a formal arrest and informing the suspect that she need not answer any questions automatically render an interrogation noncustodial. Other acts by those conducting the interrogation may establish custody. The record, however, is devoid of evidence exhibiting conduct on the part of the interrogating agents which would lead to the conclusion that Jones was in custody. No strong arm tactics were used. The defendant had not previously been

subjected to a police escort nor given commands by the interrogating agents intended to dictate the course of conduct followed by the defendant. . . .

. . . .

. . . [Jones] was in her own home and under no physical restraint. She was free to depart, free to refuse to answer any questions, and free to request the interrogating officers to leave. Jones was not compelled to be subjected to the presence of the interrogating officers. In short, she suffered no such restriction on her personal freedom as to render her "in custody." *Oregon v. Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714.

630 F.2d at 615-16. See, also, *United States v. Phillips*, 688 F.2d 52 (8th Cir. 1982).

At the hearing on Brown's motion to suppress, evidence does not show that Brown was in custody at the time he made the incriminating statements to Investigator Scott. Regarding the interview at Brown's trailer, nothing indicates that Brown was ever placed under arrest, " 'taken into custody or otherwise deprived of his freedom of action in any significant way.' " *Beckwith v. United States*, 425 U.S. 341, 347, 96 S. Ct. 1612, 48 L. Ed. 2d 1 (1976). At the time of the interview, Scott stated that Brown was not under arrest and neither uttered words nor demonstrated any conduct which dictated or restricted a course of action by Brown. During the interview, Brown was never physically restrained and was free to depart from the trailer house as well as from the presence of Investigator Scott, or otherwise free to request Scott to leave the premises. We can only characterize the entire setting at Brown's trailer as "noncustodial" and conclude that Investigator Scott was not required to give Brown the *Miranda* warning. Evidence at the suppression hearing raised no question about the voluntariness of Brown's statements made to Investigator Scott. Therefore, the district court was correct in overruling Brown's motion to suppress the incriminating statements.

## MOTIONS FOR DISMISSAL OR DIRECTED ACQUITTAL

In his second assignment of error, Brown contends that his motions for dismissal or a directed verdict should have been

sustained, because evidence "[did] not establish the elements of the crime." Brief for Appellant at 14. The gist of Brown's argument is the evidence fails to provide any basis for finding that Brown sexually penetrated the victim.

> In a criminal case a court can direct a verdict only when (1) there is a complete failure of evidence to establish an essential element of the crime charged, or (2) evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained.

*State v. Clancy*, 224 Neb. 492, 501, 398 N.W.2d 710, 717 (1987).

In determining whether evidence is sufficient to sustain a conviction in a jury trial, the Supreme Court does not resolve conflicts of evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented to a jury, which are within a jury's province for disposition. A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. *State v. Clancy, supra.* See, also, *State v. Schott*, 222 Neb. 456, 384 N.W.2d 620 (1986).

Cunnilingus is "stimulation of the vulva or clitoris with the lips or tongue." Webster's Third New International Dictionary, Unabridged 554 (1981). See, also, *State v. Kish*, 186 Conn. 757, 443 A.2d 1274 (1982); *State v. Ludlum*, 303 N.C. 666, 281 S.E.2d 159 (1981). The vulva is composed of "the external parts of the female genital organs . . . the opening between the projecting parts of the external organs." Webster's, *supra* at 2567. See, also, *State v. Ludlum, supra.* We need not indulge in an extensive anatomy lesson concerning the clitoris, an organ which realistically defies "sexual penetration" as envisioned in § 28-318(6). In view of § 28-318(6), characterizing or defining "sexual penetration," the criminal act of cunnilingus is punishable as a sexual assault similar, but not identical, to sexual assaults involving penetration of a victim's body, such as vaginal intercourse, or any other sexual activity constituting a prohibited intrusion of an assailant's or victim's body. The Legislature clearly intended that cunnilingus, that is, stimulation by the tongue or lips of any part of a female's genitalia, is an act which may subject the actor to prosecution

for first degree sexual assault under the provisions of § 28-319(1). It is difficult to imagine how attempted, but uncompleted, lingual penetration of a victim's vagina would not include cunnilingus. Moreover, we decline to require that a victim, especially a youthful victim, testify about an act of cunnilingus in vocabulary used by a gynecologist or provide a detailed description which might otherwise be found in some sordid novel. Therefore, once the perpetrator's lips or tongue touches any part of a female's genitalia, the act of cunnilingus is complete, irrespective of any actual penetration of the genitalia. See *State v. Ludlum, supra.* As aptly declared by the Supreme Court of North Carolina in *Ludlum*: "We do not choose to quibble either over the word 'stimulation' contained in the definitions of cunnilingus upon which we have relied." 303 N.C. at 674, 281 S.E.2d at 163. In this case, there was evidence from the victim that Brown placed his tongue in the victim's vaginal area and attempted, but failed, lingual penetration of the victim's vagina. According to Brown's statements made to Investigator Scott, Brown placed his tongue on the victim's vaginal area. In *State v. Piskorski*, 218 Neb. 543, 357 N.W.2d 206 (1984), this court reviewed the evidence presented in a prosecution for sexual assault by sexual penetration (cunnilingus) on a victim less than 16 years of age, a prosecution under § 28-319(1)(c), and we stated:

> Piskorski's second argument is that the evidence was insufficient to establish the elements of the crime. . . .
>
> . . . The mother testified that while her daughter's clothes were off, the defendant touched the child between the legs with his hands, rubbed her between the legs, and then kissed her between the legs. Piskorski argues that the testimony establishing that he placed his head between the child's legs and kissed her did not prove the elements of the crime. With that argument we cannot agree.

218 Neb. at 549, 357 N.W.2d at 211.

In *Piskorski*, we concluded that "the act of cunnilingus, constitutes sexual penetration within the meaning of § 28-319(1), even though there is not in fact intrusion into the body." 218 Neb. at 550, 357 N.W.2d at 212.

Courts of other jurisdictions have arrived at the same

conclusion we reached in *Piskorski*, namely, under the statutory scheme of first degree sexual assault, cunnilingus does not require penetration of a female's genitalia. See, *Partain v. State*, 63 Md. App. 260, 492 A.2d 669 (1985); *State v. Kish, supra; State v. McNeely*, 314 N.C. 451, 333 S.E.2d 738 (1985).

The State presented a prima facie case of first degree sexual assault, and the quantum of evidence in this case is such that the district court could not properly dismiss the proceedings or direct a verdict of acquittal. The court correctly overruled Brown's motions for dismissal and a directed verdict.

INSTRUCTION ON LESSER-INCLUDED OFFENSE

As his third assignment of error, Brown claims he was entitled to an instruction on sexual assault of a child (sexual contact), see § 28-320.01, as a lesser-included offense in first degree sexual assault, see § 28-319(1). However, much of what we have stated above in this opinion concerning cunnilingus is applicable in disposing of Brown's contention about instruction on a lesser-included offense. As we comprehend Brown's argument for the instruction on the lesser-included offense, when evidence failed to establish vaginal penetration of the victim, this left evidence that Brown placed his tongue on the victim's vaginal area without any penetration, which, according to Brown, is "sexual contact" described in § 28-318(5) and, therefore, sexual assault of a child, conduct condemned by § 28-320.01. Brown denied all sexual contact with the victim. However, because sexual penetration is not a necessary element for first degree sexual assault involving cunnilingus, evidence in Brown's case established the act of cunnilingus rather than intentional touching of a child-victim's body within the purview of § 28-320.01.

As we stated in *State v. Beasley*, 214 Neb. 918, 922-23, 336 N.W.2d 601, 604 (1983):

Generally, it is not prejudicial error to not instruct upon a lesser offense when the evidence entirely fails to show an offense of a lesser degree than that charged in the information. *State v. Vicars*, 207 Neb. 325, 299 N.W.2d 421 (1980). In *State v. Tamburano*, 201 Neb. 703, 271 N.W.2d 472 (1978), a prosecution for sexual assault in the first degree, the only testimony regarding penetration was

that of the victim. The defendant did not testify and argued that the jury should have been instructed on second degree sexual assault. We held that when the State offers uncontroverted testimony on an essential element of a crime, mere speculation that the jury may disbelieve the testimony does not entitle the defendant to an instruction on a lesser-included offense. . . .

. . . In [*Tamburano*] we held that if, under a "different but reasonable" view, the evidence would be sufficient to establish guilt of the lesser offense and leave a reasonable doubt as to some element included in the greater offense but not the lesser, the jury should be instructed on the lesser offense.

The district court properly refused Brown's requested instruction regarding sexual assault of a child as a lesser-included offense in first degree sexual assault.

## SENTENCE IMPOSED

Finally, Brown claims that his 3-year sentence is excessive. Brown was convicted of first degree sexual assault, a Class II felony, see § 28-319(2), which is punishable by imprisonment for not less than 1 year nor more than 50 years. See Neb. Rev. Stat. § 28-105 (Reissue 1985).

"We have regularly and repeatedly held that a sentence imposed within the statutory limits will not be modified on appeal, absent an abuse of discretion on the part of the trial court. [Citations omitted.] Furthermore, we have repeatedly held that the granting of probation as opposed to imposing of a sentence is a matter which is left to the sound discretion of the trial court, and absent a showing of abuse, this court will not on appeal disturb the trial court's denial of probation."

*State v. Clancy*, 224 Neb. 492, 502-03, 398 N.W.2d 710, 717-18 (1987). See, also, *State v. Dillon*, 222 Neb. 131, 382 N.W.2d 353 (1986). The sentence imposed upon Brown is not excessive.

AFFIRMED.