STATE OF NEBRASKA, APPELLEE, V. GARY L. HOOK, APPELLANT.

421 N.W.2d 456

Filed April 1, 1988.   No. 87-522.

Thomas M. Kenney, Douglas County Public Defender, and Timothy P. Burns, for appellant.

Robert M. Spire, Attorney General, and Fredrick F. Neid, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

Defendant has appealed his convictions by a jury of burglary, first degree sexual assault, use of a knife to commit a felony, and attempted robbery. He appeals and assigns as his sole error the claim that the evidence is insufficient as a matter of law to sustain the convictions. We affirm.

The victim testified that sometime after she had retired for the night, she awakened and saw a man standing at the foot of her bed. The man wore a nylon stocking over his face, which he periodically rolled up, allowing the victim to see his face. She further described the clothing which he was wearing, including a pair of dirty work gloves.

She then described in graphic detail how the man put a knife to her throat and asked her for money, and how he pulled the covers from her, began to rub her legs, and told her he wanted to "make love." He forced her onto her back, straddled her, and cut her nightgown with his knife; he placed his fingers in her vagina, moving them in and out several times, and then began oral sex; he unzipped his pants, unsuccessfully attempted to

enter the victim with his penis, and instructed her to take hold of it and put it in, which she refused to do. He then placed the knife at her vagina, threatened to cut her, and demanded Vaseline, which she denied having. The victim was forced down the hallway, where he cut her nightgown again until it fell off, leaving her naked. She was taken into the living room, where he again rubbed his hand between her legs; he touched her on the buttocks. He then took her to the bathroom, where the light was on, and put her in the shower while he searched for Vaseline. Finally, the intruder turned off the bathroom light and returned to the hallway. At this point, the victim broke away, unlocked the front door, and ran outside, screaming for help.

At about this time, George Adams, a resident in the victim's apartment complex, was outside walking his dog before he went to work at 4 a.m. On the stairwell, Adams ran into a young man who was looking for a party he had heard about. Being unsuccessful in helping him, Adams accompanied the young man outside, where three of the man's friends were waiting. The men visited for 10 or 15 minutes. The young men then began to leave. A moment later, Adams heard the victim screaming for help, saw her naked, and then, 2 or 3 seconds later, he heard running footsteps coming toward him from the second floor and observed a man running.

The victim pointed to the man running and said to Adams, "That's him, get him." Adams observed the man pulling something off his face and noticed that he had leather gloves on. Adams, with help from the four young men, who were still in the area, caught this man, who had stumbled on a patio step. This man was the defendant. Adams held him until the police arrived.

The police recovered a "buck" knife from the defendant, which the victim identified as the one or like the one that had been used against her in the crimes committed. Nearby, the police recovered a leg from nylon panty hose, which had been used as a mask, and two leather gloves.

The defendant's truck, in which the police discovered two packs of Camel cigarettes and a pair of work gloves similar to the ones found in the yard, was parked nearby. Two packs of Camel cigarettes were also found in the victim's bedroom. The

victim did not smoke. The police shone a light on the defendant, and the victim identified him as her attacker.

The defendant denied all involvement in the crime. He gave a story of having been engaged in a great deal of drinking, and he had parked his truck and proceeded to walk to get some air. He then forgot where he had parked his truck. He decided to try to find a friend, "Kathy," whom he had not seen in several years. Although it was later determined that no woman by that name lived at that address, he believed that her apartment was at 120 South 38th Avenue, the building where the victim resided. While looking for Kathy's car, he heard loud footsteps, heard someone yelling at him to stop, and became frightened and started running. He agrees that he was caught and held by Adams for the police.

Although the defendant claimed that he was so intoxicated that he could not continue driving, and in fact forgot where he had parked his truck, the police officers who arrested him felt that he was not drunk. Moreover, the defendant, after being handcuffed, showed a police officer where his truck was parked up the street and stated that it belonged to him and he "really needed to get it home."

The victim had several excellent opportunities to observe her attacker and positively identified the defendant as that person. The clothing worn by the defendant, his knife, his work gloves, and the Camel cigarettes, all were convincing circumstances of his guilt. His untruthful statements about his intoxication and the locating of his truck were significant factors.

In determining whether evidence is sufficient to sustain a conviction in a jury trial, the Supreme Court does not resolve conflicts of evidence, pass on the credibility of the witnesses, evaluate explanations, or reweigh evidence presented to a jury, which are within a jury's province to resolve. A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. *State v. Lane,* 227 Neb. 687, 419 N.W.2d 666 (1988); *State v. Brown,* 225 Neb. 418, 405 N.W.2d 600 (1987).

The judgment of the district court is affirmed.

AFFIRMED.