IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. AZCUNAGA-MOLINA

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

ROBERTO C. AZCUNAGA-MOLINA, APPELLANT.

Filed October 7, 2025.    No. A-24-486.

Appeal from the District Court for Colfax County: CHRISTINA M. MARROQUIN, Judge. Affirmed.

Timothy P. Matas, of Stratton, DeLay, Doele, Carlson, Buettner & Stover, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Teryn Blessin for appellee.

PIRTLE, BISHOP, and FREEMAN, Judges.

FREEMAN, Judge.

## I. INTRODUCTION

After a jury trial, Roberto C. Azcunaga-Molina was found guilty of one count of first degree sexual assault of a child, three counts of third degree sexual assault of a child, five counts of intentional child abuse, and one count of tampering with a witness. Azcunaga-Molina appeals and asserts that there was insufficient evidence to warrant his convictions for sexual assault in the first and third degree. He also argues that the district court imposed an excessive sentence for all counts. For the reasons set forth below, we affirm.

## II. BACKGROUND

On December 2, 2021, the State filed an information in the district court for Colfax County charging Azcunaga-Molina with one count of sexual assault of a child in the first degree, five

counts of intentional child abuse, and three counts of sexual assault of a child in the third degree. On August 29, 2023, an amended information was filed, charging Azcunaga-Molina with all the above offenses and adding one count of witness tampering.

A jury trial was held on February 26 through February 28, 2024. At trial, the State adduced testimony from V.A., A.A., and a licensed psychologist. V.A. was born in February 2000 and lived in Nebraska for most of her adolescence after relocating to the United States in 2003. Her mother, Maria A., dated and lived with Azcunaga-Molina for several years. Although Maria and Azcunaga-Molina never married, V.A. sometimes referred to him as her father.

In 2004, V.A. and her mother Maria, moved from Maria's mother's home into a three-bedroom trailer in Schuyler, Nebraska. V.A. and Maria lived in the trailer with 22-year-old Azcunaga-Molina, as well as Maria's uncle, his wife, and their two daughters. During their time in the trailer, V.A. shared a king-sized bed in a single bedroom with Maria and Azcunaga-Molina. Maria worked the morning shift at her job, leaving for work around 6 a.m. V.A.'s aunt and two children would remain in the home throughout the day. V.A. described that Azcunaga-Molina, who was unemployed, watched her while her mother was at work.

V.A. testified that Azcunaga-Molina would drive Maria to work in the morning, and upon returning to their shared bed, "[Azcunaga-Molina] would touch [her] vagina, skin to skin contact with his fingers." V.A. never saw Azcunaga-Molina's face during these incidents but stated that she knew it was him because of "his scent." V.A. testified that the touching occurred "[a] handful of times," and "was consistent with [Maria] getting dropped off at work and [Azcunaga-Molina] coming back." V.A. testified that she told her mother "[s]omething was touching [her]," but her mother implied that it was "possibly a ghost."

In 2006, V.A.'s half-sister, A.A., was born. Shortly thereafter, V.A., A.A., Maria, and Azcunaga-Molina moved into a two-bedroom apartment. After her maternity leave, Maria resumed working, and Azcunaga-Molina was employed at a dairy. V.A. recalled her grandmother watched her while both parties worked. Initially, V.A. had her own room, but when her uncle and his three sons moved in, she relocated her twin bed to the master bedroom, where she shared the space with A.A., Maria, and Azcunaga-Molina.

V.A. recalled three occurrences of sexual abuse within the apartment, stating the abuse "got more aggressive as [she] got older." In one incident, Azcunaga-Molina came up behind her while she was on her hands and knees and thrust his hips and penis into her butt. V.A. testified that they were both fully clothed during this interaction. On another occasion, Azcunaga-Molina pulled V.A. into a bathroom by her hair and made her perform fellatio on him. V.A. was 6 years old at the time. V.A. testified that Azcunaga-Molina would always tell her what to do, followed by instructions "[n]ot to tell [her] mom."

A few years later, while still living in the apartments, V.A. asked to spend the night at a friend's house. Azcunaga-Molina told her she could only go if she "let him rub his penis up against [her] vagina." V.A. testified that Azcunaga-Molina then made V.A. pull down her pants and underwear, and he rubbed his penis against her vagina before permitting her to leave. V.A. did not recall any penetration occurring at the time. V.A. stated that she told her mother "[Azcunaga-Molina] wouldn't leave [her] alone," but withheld details about the sexual abuse because she was scared of Azcunaga-Molina. V.A. recalled Maria speaking with Azcunaga-Molina and later telling V.A. that "[w]hatever was going on" would stop.

In 2012, V.A., A.A., Maria, and Azcunaga-Molina moved into a home basement where Maria's uncle also resided. V.A. testified that Azcunaga-Molina's sexual abuse continued while living in this residence. For example, V.A. explained that, to attend a party with her aunt, Azcunaga-Molina required her to perform fellatio on him in the guest bedroom. V.A. recalled that her mother, aunt, and two cousins remained in the living room. She was between the ages of 14 and 16 at the time. On another occasion, V.A. requested permission to go to a fair with friends over Labor Day. Azcunaga-Molina said no, and following her friend's departure, told V.A. that if she wanted to go to the fair, she would "have to let him lick [her] private area, [her] vagina." V.A. testified that, in response, she went to the master bedroom, where Azcunaga-Molina performed cunnilingus on her for five minutes. V.A. further reported a later event where Azcunaga-Molina drove her to a friend's house for a sleepover, but before reaching the residence, Azcunaga-Molina demanded to "suck on [her] right nipple," which he did in the vehicle.

In June 2015, V.A. and her family moved into a home where V.A. described multiple incidents of inappropriate behavior occurring. For instance, while V.A. was looking for a pair of shoes in the master bedroom closet, Azcunaga-Molina came up to her and "pulled down his pants and was trying to show [V.A.] his penis saying, 'don't act like you've never seen penis before.'" V.A. also testified that Azcunaga-Molina would hide her car keys in his bedroom. When V.A. entered Azcunaga-Molina's room to find the keys, Azcunaga-Molina would masturbate in front of her. Around this time, V.A. also began driving lessons. During one lesson, V.A. stated that Azcunaga-Molina "would pull down his pants, his underwear, and start stroking his penis." The final incident between V.A. and Azcunaga-Molina occurred before the end of V.A.'s senior year of high school, when she was washing dishes. V.A. testified that Azcunaga-Molina brushed his penis up against her butt and thrusted his hips into her while they were both fully clothed.

In 2019, V.A. started college and moved out of the house and into her aunt and uncle's. V.A. reported that she "just couldn't take it any longer, and [she] knew it was never going to stop." However, V.A. moved back home once her aunt became pregnant. At that time, V.A. recalled living in the basement and noticing that her underwear would be laid out on either the top of the laundry basket or on the sink. However, V.A. conceded that she did not know who did that. In October 2021, V.A. moved to her grandmother's home and never returned. The following month, in November 2021, 21-year-old V.A. and 15-year-old A.A. reported the incidents to a community center. The center referred the girls to law enforcement. Their statements prompted an investigation that led to Azcunaga-Molina's arrest.

V.A.'s half-sister, A.A., testified that she did not witness any sexual abuse between V.A. and her father, Azcunaga-Molina, but recalled being in the backseat of the car when her father stopped the vehicle and told V.A. "[she had] to do something in order for [her] to get out of the car." At that time, the family was living in the basement, where they remained between 2011 and June 2015. A.A. recalled that her father, Azcunaga-Molina, was the disciplinarian and often struck V.A. and A.A. with a belt. The belt would leave marks on the back of A.A.'s thighs. After the family moved into a different home, A.A. recalled an incident involving V.A. in the living room while watching a television show depicting a group of people partying, drinking, and engaging in sexual contact. When Azcunaga-Molina entered, he looked at the television and asked V.A. "why do you watch shows like that if you don't even like it how I do it to you." He then proceeded to smack V.A. on the butt.

A.A. further stated that V.A.'s keys would frequently go missing. When V.A. finally found the keys, she would return visibly upset from Azcunaga-Molina's room. Azcunaga-Molina would leave the room shortly thereafter. Furthermore, A.A. testified that she and V.A. usually washed their own clothes, but on one occasion Azcunaga-Molina brought up the laundry, and V.A.'s thongs were distinctly laid out on top of the basket. A.A. recalled that her father continued to physically abuse her with a belt while living in the home between 2015 and 2019.

Additionally, a licensed psychologist for the State of Nebraska described the dynamics of delayed reporting in sexual abuse cases, explaining how victims often experience confusion and trauma that can postpone disclosure. She elaborated on the concept of "scripted events," where repetitive abuse incidents can cause memories to blend, making it difficult for victims to attach the correct facts and circumstances to the incident. The psychologist discussed factors affecting a victim's willingness to report abuse, indicating that early tentative disclosures serve as a way for children to gauge the reactions of caregivers, particularly biological parents. The nature of the parents' response, being either supportive or dismissive, significantly impacts the likelihood of further disclosure. Moreover, emotional barriers such as fear, guilt, and concern over disrupting family stability frequently impact disclosure.

The State offered multiple exhibits including images of the various homes, mockup floor plans, and a childhood photograph of V.A. After the State rested, Azcunaga-Molina moved to dismiss the case. He argued that the State did not prove beyond a reasonable doubt that he was guilty on all counts. The court overruled the motion.

Azcunaga-Molina called two witnesses in his defense. Maria stated in 2004, while V.A. and Azcunaga-Molina lived in the trailer, she worked the first shift at 6 a.m. and Azcunaga-Molina worked the evening shift from 3 to 11 p.m. Maria asserted that a neighbor drove her to work, and Azcunaga-Molina had his own car and drove himself. Maria initially claimed that Azcunaga-Molina did not drive her to work between 2004 and 2006 but admitted on cross-examination that he drove her twice. Maria testified that while she was at work, a woman named Patricia cared for V.A. for about two months, after which her aunt began watching her.

Maria testified that after giving birth to A.A., she stayed home to care for the children full time. When the family later moved into the apartment, Maria stated there was no opportunity for V.A. to be alone with Azcunaga-Molina. Maria explained that throughout their time in the apartment, V.A.'s aunt regularly picked V.A. up for various events. Maria claimed that V.A. never needed permission to go with her.

Maria further testified that V.A. never voiced concerns about Azcunaga-Molina and that she never saw any inappropriate contact between them. However, Maria later admitted that she, Azcunaga-Molina, and V.A. had a conversation addressing complaints raised by V.A. On cross-examination, Maria admitted, "There's some things I do believe, there's some that I don't. Because there's some of those that are just very hard."

Azcunaga-Molina testified on his own behalf. He denied all allegations of sexual misconduct and stated that he never touched V.A. inappropriately at any time. Azcunaga-Molina testified that while living in the trailer between 2004 and 2006, he worked the second shift and drove Maria to her first shift on two occasions. Azcunaga-Molina asserted that during this period, V.A.'s aunt and her cousin watched V.A. According to Azcunaga-Molina's testimony, when Maria left for work in the mornings, 4-year-old V.A. was immediately taken out of the shared bed to

either sleep in her cousin's room or go to the babysitter's. Azcunaga-Molina maintained that he was never alone with V.A. while they lived in the trailer.

Azcunaga-Molina testified that when the family moved into the apartments, Maria did not return to work. Azcunaga-Molina claimed that during the 5 to 6 years they lived in the apartment, he was never alone with V.A. or A.A. He maintained that when the family later moved into the basement house, he was not alone with the girls then either. Azcunaga-Molina also testified that he never taught V.A. how to drive or drove her anywhere alone. On cross-examination, however, Azcunaga-Molina admitted that at some point he was the only adult in the car with V.A. and A.A. Addressing other allegations, Azcunaga-Molina explained that he would sometimes bring V.A. and A.A.'s clothes out from the laundry room but asserts that he never intentionally laid out V.A.'s underwear on the top of the basket. Azcunaga-Molina maintained that V.A. fabricated these claims because she did not want him and Maria to marry.

On February 28, 2024, the jury found Azcunaga-Molina guilty of all charges. The court ordered a presentence investigation report (PSR) as well as a 90-day evaluation to include a psychosexual evaluation. Sentencing occurred on June 26, 2024. Each party was given an opportunity to argue its position on sentencing. The court noted it had reviewed the PSR and had considered the 90-day evaluation and psychosexual evaluation. The court further indicated that it had considered "the statutory factors [the court is] required to consider . . . evidence during the course of trial . . . [and the] underlying facts which bring about the 10 convictions before the Court."

The court found that based on the PSR and all other relevant information, this was an aggravated offense. On appeal, Azcunaga-Molina failed to request the PSR. However, the district court and the parties recounted portions of the report during sentencing. Specifically, Azcunaga-Molina pointed out that he was 42 years old at the time of sentencing, had no criminal history, and was found to be of low risk to reoffend.

The court highlighted that the offenses of sexual penetration of a child continued over the course of 10 years, and despite Azcunaga-Molina's low testing scores, there were repetitive reported instances of sexual violence toward teenage girls which would make the true risk of recidivism higher. Further, the court stated that "a lesser sentence would depreciate the seriousness of the crimes [and] would promote disrespect for the law." On one count of first degree sexual assault of a child, the court sentenced Azcunaga-Molina to a period of 30 to 60 years' imprisonment. On each of the five counts of child abuse, the court sentenced Azcunaga-Molina to a period of 3 years' imprisonment. On each of the three counts of third degree sexual assault of a child, the court sentenced Azcunaga-Molina to a period of 3 years' imprisonment. On one count of witness tampering, the court sentenced Azcunaga-Molina to a period of incarceration of 1 to 5 years' imprisonment. All sentences were ordered to run concurrently, aside from the sentence for witness tampering, which was ordered to run consecutive to the other counts.

Azcunaga-Molina appeals.

### III. ASSIGNMENTS OF ERROR

Azcunaga-Molina assigns, summarized and restated, that (1) there was insufficient evidence to warrant his conviction for first degree sexual assault of a child and third degree sexual assault of a child and (2) the district court imposed an excessive sentence.

## IV. STANDARD OF REVIEW

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Tvrdy*, 315 Neb. 756, 1 N.W.3d 479 (2024).

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *Id.* An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## V. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

Azcunaga-Molina contends that the evidence was insufficient to support his convictions of one count of first degree sexual assault of a child and three counts of third degree sexual assault of a child. He does not challenge his convictions for witness tampering or child abuse. Our analysis will be limited accordingly.

In a criminal case, the evidence upon which a jury may rely in making its findings may be direct, circumstantial, or a combination thereof. *State v. Escamilla*, 291 Neb. 181, 864 N.W.2d 376 (2015). In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Samayoa*, 292 Neb. 334, 873 N.W.2d 449 (2015). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Clark*, 315 Neb. 736, 1 N.W.3d 487 (2024).

### (a) First Degree Sexual Assault of Child

A person commits sexual assault of a child in the first degree when he or she subjects another person under 12 years of age to sexual penetration and the actor is at least 19 years of age or older. Neb. Rev. Stat. § 28-319.01(1)(a) (Reissue 2016). For purposes of this statute,

> Sexual penetration means sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical, nonhealth, or nonlaw enforcement purposes.

Neb. Rev. Stat. § 28-318(6) (Cum. Supp. 2022). Fellatio is "oral stimulation of the penis." *State v. Bruna*, 12 Neb. App. 798, 830, 686 N.W.2d 590, 615 (2004). Cunnilingus is "stimulation of the

vulva or clitoris with the lips or tongue." *State v. Brown*, 225 Neb. 418, 428, 405 N.W.2d 600, 606 (1987).

Azcunaga-Molina's argument regarding the insufficiency of the evidence focuses on the inadequacy of V.A.'s testimony. Azcunaga-Molina asserts that it was uncorroborated because the State did not provide physical evidence of injury or any eyewitnesses to the events. However, circumstantial evidence is not inherently less probative than direct evidence, and a fact proved by circumstantial evidence is nonetheless a proven fact. *State v. Jeremiah T.*, 319 Neb. 133, 21 N.W.3d 313 (2025). The slightest intrusion into the genital opening is sufficient to constitute penetration, and such element may be proved by either direct or circumstantial evidence. *State v. Garcia-Contreras*, 31 Neb. App. 657, 987 N.W.2d 641 (2023). Furthermore, the State is not required to corroborate a victim's testimony in cases of first degree sexual assault; if believed by the finder of fact, the victim's testimony alone is sufficient. *State v. Anders*, 311 Neb. 958, 977 N.W.2d 234 (2022). See also Neb. Rev. Stat. § 29-2028 (Reissue 2016).

The evidence, when viewed in the light most favorable to the State, established that Azcunaga-Molina sexually assaulted V.A. in the first degree. V.A. testified that Azcunaga-Molina pulled her by the hair and forced her to perform fellatio on him in their apartment bathroom when she was 6 years old. Sexual penetration includes the act of fellatio. See § 28-319.01(1)(a). Azcunaga-Molina, having been born in 1982, was 24 years old at the time of the alleged assault. There was no dispute at trial over the ages of Azcunaga-Molina and V.A. During closing argument, the State explained that this incident corresponded to the allegations in count I for first degree sexual assault of a child. This evidence is sufficient to support Azcunaga-Molina's conviction of first degree sexual assault of a child.

### (b) Third Degree Sexual Assault of Child

Azcunaga-Molina was charged with three counts of third degree sexual assault of a child. A person commits sexual assault of a child in the second or third degree if he or she subjects another person 14 years of age or younger to sexual contact and the actor is at least 19 years of age or older. Neb. Rev. Stat. § 28-320.01(1) (Reissue 2016). Section 28–318(5) defines the term "sexual contact" as follows:

> Sexual contact means the intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts. Sexual contact also means the touching by the victim of the actor's sexual or intimate parts or the clothing covering the immediate area of the actor's sexual or intimate parts when such touching is intentionally caused by the actor. Sexual contact includes only such conduct which can be reasonably construed as being for the purpose of sexual arousal or gratification of either party.

Viewing the evidence in light most favorable to the State, we conclude that a rational fact finder could find that Azcunaga-Molina sexually assaulted V.A. in the third degree. During the trial, the State introduced testimony from V.A. recounting six separate incidents of sexual contact by Azcunaga-Molina. These incidents spanned over the course of 10 years, with the first incident occurring in 2004. The State establishes that Azcunaga-Molina touched V.A.'s vagina with his hands at the age of 4. Between 2006 and 2011, Azcunaga-Molina thrust his hips and penis into

V.A.'s butt from behind while fully clothed and on another occasion, rubbed his penis against V.A.'s vagina without penetration. V.A. was approximately 6 to 11 years old at the time. V.A.'s testimony further establishes that Azcunaga-Molina forced V.A. to perform fellatio on him, sucked on her right nipple, and performed cunnilingus on her. All three of these incidents occurred while the family lived in the basement of a home between 2011 and June 2015. V.A. turned 15 in February 2015, 4 months before her family moved. However, V.A.'s testimony established that at least one event, the cunnilingus, occurred on Labor Day weekend, which predated her 15th birthday and the family's move. Thus, it was reasonable for the jury to infer that the events underlying the charge occurred before V.A. turned 15.

The evidence further established that Azcunaga-Molina was born in May 1982 and that V.A. was born in February 2000. From the combined evidence, a rational trier of fact could have found that Azcunaga-Molina, a person at least 19, subjected V.A., a child 14 or younger, to sexual contact in three separate ways: (1) by intentionally touching the "victim's sexual or intimate parts," (2) by intentionally touching the "clothing covering the immediate area of [V.A.'s] sexual or intimate parts," which includes the buttocks, or (3) by intentionally causing V.A. to touch his "sexual or intimate parts." See § 28–318(5). We therefore conclude that there was sufficient evidence to convict Azcunaga-Molina of third degree sexual assault of a child.

Accordingly, we affirm these convictions.

### 2. EXCESSIVE SENTENCE

Azcunaga-Molina argues that the district court abused its discretion by imposing an excessive sentence. He specifically asserts that the district court failed to adequately account for his age, lack of criminal history, and his low risk to reoffend assessment scores. Azcunaga-Molina does not argue that his sentences were outside the statutory limits. The State disagrees but notes there may be plain error in Azcunaga-Molina's sentence. The State contends that the district court erred in sentencing Azcunaga-Molina to determinate sentences of 3 years on each of the intentional child abuse and third degree sexual assault of a child convictions. However, the State also argues that any error committed is harmless, as these sentences are subsumed by the correct 30 to 60 year sentence imposed for the Class IB felony.

Azcunaga-Molina was convicted of one count of first degree sexual assault of a child, a Class IB felony; three counts of third degree sexual assault of a child, a Class IIIA felony; five counts of intentional child abuse, a Class IIIA felony; and witness tampering, a Class II felony. He received sentences of 30 to 60 years' imprisonment for the Class IB conviction, 3 years for each Class IIIA conviction, and 1 to 5 years for the Class II conviction. All sentences were within the statutory range. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2022). All sentences were ordered to run concurrently, aside from the sentence for witness tampering, which was ordered to run consecutive to the other counts.

First, we address whether plain error occurred. Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Mendez-Osorio*, 297 Neb. 520, 900 N.W.2d 776 (2017). Neb. Rev. Stat. § 29-2204.02(4) (Reissue 2016) provides that when a Class IIIA felony is committed on or after August 30, 2015, and is sentenced consecutively or concurrently with a

Class IB felony, the court shall impose an indeterminate sentence within the applicable range in § 28-105 that does not include a period of post-release supervision.

Neb. Rev. Stat. § 28-116 (Reissue 2016) describes "[a]n offense shall be deemed to have been committed prior to August 30, 2015, if any element of the offense occurred prior to such date." In this case, the first degree sexual assault and three charges of third degree sexual assault occurred before August 30, 2015. The evidence established that the first degree sexual assault occurred in 2006, and the third degree sexual assault charges occurred between 2004 and February 2015; therefore, § 29-2204.02(4) does not apply. Accordingly, we find no plain error.

Counts II, IV, VI, and VIII are child abuse charges arising from the sexual assaults committed between 2004 and June 2015. Each charge corresponds to a specific assault: count II to the 2006 first degree sexual assault, count IV to the 2004 third degree sexual assault, count VI to the third degree sexual assaults occurring between 2006 and 2012, and count VIII to the third degree sexual assaults occurring between 2013 and February 2015. Provided the sexual assault convictions themselves do not constitute plain error; the related child abuse convictions likewise do not constitute plain error.

In count IX, Azcunaga-Molina was convicted for intentional child abuse of his daughter A.A. A.A. testified that Azcunaga-Molina punished her with a belt while they lived in the basement between 2011 and June 2015. The abuse continued after they moved into their next home, where A.A. still resides. The evidence is sufficient for the jury to find the offense, or some element thereof, occurred prior to August 30, 2015, such that § 29-2204.02(4) does not apply. Thus, there is no plain error as to the sentence on count IX.

Having determined that the sentences imposed by the court were within the applicable statutory sentencing ranges and no plain error exists, we next consider Azcunaga-Molina's argument challenging the district court's consideration of factors supporting his sentence. Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors, as well as any applicable legal principles in determining the sentence to be imposed. *State v. Lara*, 315 Neb. 856, 2 N.W.3d 1 (2024). When imposing a sentence, the sentencing court is to consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *Id*. However, the sentencing court is not limited to any mathematically applied set of factors. *State v. Dehning*, 296 Neb. 537, 894 N.W.2d 331 (2017). The appropriateness of a sentence is necessarily a subjective judgment that includes the sentencing judge's observations of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

There is nothing in the record to suggest that the district court did not consider relevant factors. In fact, the court expressly stated at the sentencing hearing that it considered the nature and circumstances of the crimes; evidence during the trial; information in the PSR; and all statements made during the trial. During sentencing the district court stated "the offenses were sexual perpetration of a child for approximately 10 years, age 4 to 14. According to the evaluations, that despite scoring low, there are repetitive reported instances of sexual violence towards teenage girls which would make the true risk of recidivism higher." Further, the court noted that the

repetitive nature of the sexual violence toward young women, as well as the significant risk areas identified by the evaluator led to a recommendation for sex offender treatment programs that either limited contact with the victim or required absolutely no contact.

The Nebraska Supreme Court has rejected the notion that a sentencing court is required to articulate on the record that it has considered each sentencing factor and to make specific findings as to the facts that bear on each of those factors. *State v. Miller*, 315 Neb. 951, 2 N.W.3d 345 (2024). Moreover, an appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Applehans*, 314 Neb. 653, 992 N.W.2d 464 (2023). Azcunaga-Molina complains his sentence is lengthy but does not assign that it is outside the applicable statutory range. Instead, he argues that the court should have mitigated his sentence. We reject that claim. The district court recognized Azcunaga-Molina's offenses were violent and repetitive. Based on the record before us, we cannot say that the district court imposed excessive sentences.

## VI. CONCLUSION

For the reasons stated above, we affirm Azcunaga-Molina's convictions and sentences.

AFFIRMED.