Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/28/2023 01:04 AM CDT

- 657 -

**Nebraska Court of Appeals Advance Sheets**
**31 Nebraska Appellate Reports**
STATE v. GARCIA-CONTRERAS
Cite as 31 Neb. App. 657

**State of Nebraska, appellee, v. Emilio Garcia-Contreras, appellant.**

___ N.W.2d ___

Filed March 21, 2023.    No. A-22-316.

1. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

2. **Sentences: Appeal and Error.** A sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion by the trial court.

3. **Judges: Words and Phrases.** A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.

4. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved on direct appeal; the determining factor is whether the record is sufficient to adequately review the question.

5. **Effectiveness of Counsel: Records: Proof: Appeal and Error.** The record is sufficient to resolve on direct appeal a claim of ineffective assistance of counsel if the record affirmatively proves or rebuts either deficiency or prejudice with respect to the defendant's claims.

6. **Sexual Assault: Proof: Words and Phrases.** The slightest intrusion into the genital opening is sufficient to constitute sexual penetration

- 658 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
STATE v. GARCIA-CONTRERAS
Cite as 31 Neb. App. 657

under Neb. Rev. Stat. § 28-318(6) (Reissue 2016), and such element may be proved by either direct or circumstantial evidence.

7. **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense.

8. ____ : ____. To show deficient performance, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

9. ____ : ____. To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

Appeal from the District Court for Douglas County: Leigh Ann Retelsdorf, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Allyson A. Mendoza for appellant.

Douglas J. Peterson, Attorney General, and Jordan Osborne for appellee.

Pirtle, Chief Judge, and Riedmann and Arterburn, Judges.

Pirtle, Chief Judge.

### INTRODUCTION

Emilio Garcia-Contreras appeals from his convictions and sentences on two counts of first degree sexual assault of a child. Following a bench trial, the district court for Douglas County found Garcia-Contreras guilty on both counts and sentenced him to 30 to 70 years of incarceration on each count, which sentences were to be served concurrently. On appeal, Garcia-Contreras challenges the sufficiency of the evidence against him and argues that the district court imposed excessive sentences. Garcia-Contreras further raises two claims of ineffective assistance of trial counsel. For the reasons that follow, we affirm.

- 659 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
STATE v. GARCIA-CONTRERAS
Cite as 31 Neb. App. 657

## BACKGROUND

On February 3, 2022, the State filed a second amended information against Garcia-Contreras in the district court. The information charged Garcia-Contreras with two counts of first degree sexual assault of a child. Both counts of the information alleged that Garcia-Contreras, who was at least 19 years of age, subjected Y.A., who was a child under 12 years of age, to sexual penetration, in violation of Neb. Rev. Stat. § 28-319.01(1)(a) and (2) (Reissue 2016). The only difference between the two counts was the date of the alleged offenses. In count 1, Garcia-Contreras was alleged to have subjected Y.A. to sexual penetration on or about June 5, 2018, through November 20, 2019. In count 2, Garcia-Contreras was alleged to have subjected Y.A. to sexual penetration on or about November 21, 2019. The case proceeded to a bench trial held over the course of 3 days from February 8 to 10, 2022, and the following evidence was adduced.

Y.A.'s mother, Karelin Gomez, testified that Y.A. is the oldest of her three children and that Y.A. was 6 years old as of November 21, 2019. At that time, Gomez and her three children lived with Gomez' mother, Maria Abarca, at an address on E Street in Omaha, Nebraska. Garcia-Contreras, who was identified as Abarca's boyfriend, also lived at the E Street address, along with his two minor children. Prior to September 2019, Abarca lived with Garcia-Contreras and his two children at an address on U Street in Omaha and Gomez and her three children lived in Lincoln, Nebraska, with the man she identified as the father of her children. They separated around September 2019, and Gomez and the children came to live with Abarca and Garcia-Contreras in Omaha. Gomez and the children initially moved into the U Street address, and the whole family relocated to the E Street address shortly thereafter.

Prior to moving to Omaha, Gomez' children typically spent at least one or two weekends a month with Abarca and Garcia-Contreras at the U Street address. Abarca also recalled

- 660 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
STATE v. GARCIA-CONTRERAS
Cite as 31 Neb. App. 657

at least one weekend in 2018 which the children spent alone with Garcia-Contreras at that address. Gomez recalled that Y.A. began exhibiting some hesitation about the weekend visits with Abarca and Garcia-Contreras in the months prior to moving to Omaha.

Gomez noticed further behavioral changes in Y.A. after moving to Omaha. Gomez recalled that Y.A. started to "jump" when Gomez would attempt "to wash her private parts." Gomez further recalled instances in which Y.A. "would just wake up, like hysterically crying." Additionally, Abarca noticed that Y.A. was increasingly reluctant to have contact with Garcia-Contreras in the weeks leading up to November 21, 2019. At some point prior to November 21, Y.A. disclosed an allegation that Garcia-Contreras had inappropriately "touched her butt," and Abarca testified that Y.A. seemed to be afraid of Garcia-Contreras.

In the early morning hours of November 21, 2019, Abarca went to Y.A.'s bedroom to check on her and observed that she was "very scared and she was shaking." Abarca asked what was wrong, and Y.A. responded that "'Grandpa is annoying' . . . '[b]ecause when everybody is sleeping, he's come to my room and he touch my cula.'" It was later revealed that "cula" is a word that Y.A. used to refer to her vagina at the time. Gomez was in the basement of the house when she heard Abarca calling for Gomez to hurry upstairs. Gomez discovered Abarca comforting Y.A., and Garcia-Contreras was standing in the hallway outside Y.A.'s room. Y.A. and Abarca were both crying, and Abarca stated that Garcia-Contreras had inappropriately touched Y.A. Abarca confronted Garcia-Contreras, who denied the allegation and promptly left the home, after which Gomez and Abarca contacted law enforcement.

A law enforcement officer responded to the E Street address at approximately 9:30 a.m. and made contact with Gomez and Abarca. Abarca reported that when she went to wake Y.A. up that morning, Y.A. was "upset" and stated that "grandpa

- 661 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
STATE v. GARCIA-CONTRERAS
Cite as 31 Neb. App. 657

had touched her." The officer transported Y.A. to Project Harmony, a child advocacy center, for a forensic interview and medical examination. During the interview, Y.A. disclosed allegations that Garcia-Contreras had digitally penetrated her vagina and had inappropriately touched her "butt." It was believed that Y.A.'s disclosure regarding digital penetration was an "acute disclosure," meaning the abuse occurred within 24 to 48 hours of disclosure. Y.A. made a number of additional disclosures during the medical examination that were believed to be "delayed disclosures," meaning the alleged abuse occurred more than 48 hours prior to disclosure.

The manager of the forensic interview program at Project Harmony testified that delayed disclosures are much more common due to a number of factors. She added that one such factor is a possible reluctance to report abuse when the perpetrator is a close family member. She further testified that children tend to disclose abuse over time as opposed to all at once and that the details of the reports may change depending on whom the child is talking to and how that individual responds to the disclosures. She also testified that children can have difficulty describing specific episodes of abuse if the abuse was frequent and ongoing because the incidents can blur together.

Ashley Harris, the nurse practitioner who conducted Y.A.'s medical examination, testified to additional details of the alleged abuse that Y.A. disclosed during the examination. With respect to the acute disclosure of digital penetration, Y.A. reported to Harris that sometime in the night prior to November 21, 2019, Garcia-Contreras "put his fingers in what [Y.A.] called her penis." When Harris sought to clarify what Y.A. meant by "penis," Y.A. "pointed to her vaginal area and said he twisted his fingers inside there to make it red." Y.A. described Garcia-Contreras pulling her pants and underwear down to her knees, and she reported that the contact "made it feel hot when she would go pee." Harris noted that Y.A. used

- 662 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
STATE v. GARCIA-CONTRERAS
Cite as 31 Neb. App. 657

a lot of hand gestures to describe the contact and opined that Y.A. was "very descriptive for her age."

Y.A. further disclosed previous occasions in which Garcia-Contreras would make Y.A. touch her mouth to his penis. Y.A. reported that Garcia-Contreras "pushed her head to his penis" the night before but that she refused on that occasion. When asked about occasions in which Y.A.'s mouth did touch Garcia-Contreras' penis, Y.A. described a white substance that "came out of his little hole on his penis and that he would want her to drink it." Y.A. also disclosed prior incidents in which Garcia-Contreras would put his mouth on her vagina and reported that he "bit her or would lick her and . . . that it would hurt." Y.A. further reported previous occasions in which Garcia-Contreras' penis "went in [Y.A.'s] penis" and that it "felt hot."

After gathering this history from Y.A., Harris collected a number of DNA samples and Y.A.'s underwear, all of which were provided to law enforcement. Harris then conducted a sexual assault examination and tested Y.A. for sexually transmitted infections, all of which returned normal results. With respect to the sexual assault examination, Harris testified she did not expect to discover injuries based on Y.A.'s disclosures, and she clarified that it is not unusual to obtain a normal result on a sexual assault examination because the "areas of the body that can be penetrated" can "stretch easily without injury." In fact, Harris referred to research indicating that sexual assault examinations reveal normal results in "95 percent" of delayed disclosure cases and "80 percent" of acute disclosure cases. Altogether, Harris testified that the results of the medical examination were consistent with the disclosures made by Y.A.

Y.A. also testified at trial, further describing her recollection of the alleged abuse. Y.A. was 8 years old at the time. Y.A. identified Garcia-Contreras in the courtroom and described him as the "guy who did a lot of bad stuff to me." As mentioned above, Y.A. refers to her vagina as her "cula," and

Y.A. testified to multiple occasions in which Garcia-Contreras touched her "cula" with the part of his body "where he pees." Y.A. recalled at least one occasion in which Garcia-Contreras came into her room at night and touched "where he pees" to the inside of her "cula." Y.A. further recalled at least one occasion in which Garcia-Contreras took Y.A. to pick up pizza, and he touched her "cula" with "[w]here he pees" when they were parked in a parking lot. Y.A. testified that Garcia-Contreras had also put his hand on her "cula" in the past. Y.A. estimated that Garcia-Contreras started touching her in these ways when she was 5 years old, and Y.A. turned 5 years old in June 2018. Y.A. had difficulty remembering specific details of the abuse, but she recalled incidents occurring at both the E Street and U Street addresses.

Following the forensic interview and medical examination, law enforcement contacted Garcia-Contreras, who then voluntarily transported himself to a formal interview with law enforcement around 2 p.m. on November 21, 2019. Following that interview, Garcia-Contreras was placed under arrest. Evidence collected during Y.A.'s medical examination, as well as additional items suspected of containing DNA evidence, was sent to be analyzed. The parties stipulated at trial that the chain of custody of pertinent DNA evidence was maintained at all times.

A DNA analyst, Joe Choquette, testified that analysis of two swabs collected during the sexual assault examination returned a presumptive positive result for seminal fluid, but that the confirmatory tests were negative. The presumptive test was described as an "acid phosphatase" test, and the confirmatory test was described as a "prostate specific antigen" (PSA) test. Choquette was careful to limit his testimony to the refrain that those two samples were "[acid phosphatase] positive and PSA negative." Choquette noted that it is possible to have a negative PSA and yet have semen present, just as it is possible to have a positive PSA without the presence of semen.

- 664 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
STATE v. GARCIA-CONTRERAS
Cite as 31 Neb. App. 657

Choquette also analyzed multiple samples collected from the underwear that Y.A. was wearing on the morning of November 21, 2019. A swab collected from the outside waistband of the underwear revealed a mixture of DNA from three individuals, and Garcia-Contreras could not be excluded as a minor contributor. Specifically, Choquette testified that it was 3,260 times more likely that the mixture contained DNA from Y.A., Garcia-Contreras, and one unknown individual than DNA from Y.A. and two unknown individuals. Choquette testified that this established "moderate support" for the conclusion that Garcia-Contreras' DNA was included in the mixture.

On February 10, 2022, the district court found Garcia-Contreras guilty on both counts of the second amended information. Following a presentence investigation and hearing, the court sentenced Garcia-Contreras to 30 to 70 years of incarceration for each conviction and ordered the sentences to run concurrently. Garcia-Contreras appealed.

## ASSIGNMENTS OF ERROR

Garcia-Contreras assigns, restated, that the district court erred in finding Garcia-Contreras guilty without sufficient evidence. Garcia-Contreras also assigns that the district court imposed excessive sentences and raises two claims of ineffective assistance of trial counsel.

## STANDARD OF REVIEW

[1] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Stack*, 307 Neb. 773, 950 N.W.2d 611 (2020). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

- 665 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
STATE v. GARCIA-CONTRERAS
Cite as 31 Neb. App. 657

[2,3] A sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion by the trial court. *State v. Greer*, 312 Neb. 351, 979 N.W.2d 101 (2022). A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *Id.*

[4,5] The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved on direct appeal; the determining factor is whether the record is sufficient to adequately review the question. *State v. Blake*, 310 Neb. 769, 969 N.W.2d 399 (2022). The record is sufficient to resolve on direct appeal a claim of ineffective assistance of counsel if the record affirmatively proves or rebuts either deficiency or prejudice with respect to the defendant's claims. *Id.*

## ANALYSIS

*Sufficiency of Evidence.*

Garcia-Contreras first challenges the sufficiency of the evidence against him on both counts of the second amended information. Garcia-Contreras argues that the State failed to prove that Garcia-Contreras subjected Y.A. to sexual penetration at any time. In support of this contention, Garcia-Contreras points to various alleged conflicts in the evidence and challenges the credibility of certain witnesses, including Y.A. However, we do not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Rather, we must view the evidence in the light most favorable to the prosecution, and then we determine whether a rational trier of fact could have found the essential elements of counts 1 and 2 beyond a reasonable doubt. The only element of the charges in dispute is whether Garcia-Contreras subjected Y.A. to sexual penetration on or about the dates alleged.

[6] Neb. Rev. Stat. § 28-318(6) (Reissue 2016) provides in pertinent part that sexual penetration means sexual

- 666 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
STATE v. GARCIA-CONTRERAS
Cite as 31 Neb. App. 657

intercourse in its ordinary meaning, cunnilingus, fellatio, or any intrusion, however slight, of any part of the actor's or victim's body into the genital opening of the victim's body which can be reasonably construed as being for nonmedical, nonhealth, or nonlaw enforcement purposes. The slightest intrusion into the genital opening is sufficient to constitute penetration, and such element may be proved by either direct or circumstantial evidence. *State v. Archie*, 273 Neb. 612, 733 N.W.2d 513 (2007).

With regard to count 1, Y.A. disclosed a number of instances in which Garcia-Contreras subjected her to sexual penetration in the ordinary sense, cunnilingus, and fellatio between June 5, 2018, and November 20, 2019. From June 5, 2018, to September 2019, Garcia-Contreras had repeated access to Y.A. when she would visit the U Street address, including at least one weekend in which Garcia-Contreras cared for the children alone. From September to November 20, 2019, Garcia-Contreras had even more consistent access to Y.A., as she now lived under the same roof.

On appeal, Garcia-Contreras emphasizes that the E Street address was a crowded home and that Y.A. often shared a bed with her younger brother. While that is true, Y.A. reported that the abuse often occurred at night "'when everybody is sleeping.'" Moreover, Gomez testified that Y.A.'s younger brother was a "heavy sleeper" and indicated that it was not unusual for some or all of the children to "sneak" downstairs and sleep with her instead of staying in their room upstairs. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have concluded that Garcia-Contreras subjected Y.A. to sexual penetration on at least one occasion between June 5, 2018, and November 20, 2019.

With regard to count 2, Y.A. made an acute disclosure on November 21, 2019, alleging that Garcia-Contreras digitally penetrated her vagina sometime during the night before. Y.A. provided a detailed description of the incident during the forensic interview and medical examination. Y.A. described

Garcia-Contreras removing her pants and underwear prior to the abuse, and Garcia-Contreras' DNA was found on the outside waistband of the underwear that Y.A. was wearing at the time. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have concluded that Garcia-Contreras subjected Y.A. to sexual penetration on or about November 21, 2019.

*Excessive Sentences.*

Garcia-Contreras next assigns that the district court imposed excessive sentences. Garcia-Contreras does not dispute that the sentences imposed by the district court were within the statutory limits. Rather, Garcia-Contreras argues that the district court failed to adequately account for various mitigating factors, such as Garcia-Contreras' background, limited education, and lack of criminal record. However, there is no indication in the record that the district court failed to account for these mitigating factors. To the contrary, all of the information to which Garcia-Contreras refers was contained within the presentence investigation report, and the court had full access to that report. Moreover, the court explicitly noted that it had considered information such as Garcia-Contreras' "age, his background, [and] his criminal history." Upon our review of the record, we cannot say that the sentences imposed by the district court amounted to an abuse of discretion.

*Ineffective Assistance of Counsel.*

Garcia-Contreras raises two claims of ineffective assistance of trial counsel. However, before addressing the merits of those claims, we must first resolve the State's contention that Garcia-Contreras' claims are premature because his trial counsel remains counsel of record on appeal. See *State v. Parnell*, 294 Neb. 551, 883 N.W.2d 652 (2016) (ineffective assistance claims raised on direct appeal by trial counsel are premature and will not be addressed). Garcia-Contreras was represented at trial by attorney Alexander McAtee. Following trial, on

- 668 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
STATE v. GARCIA-CONTRERAS
Cite as 31 Neb. App. 657

April 27, 2022, McAtee filed a notice of appeal and motion to proceed in forma pauperis on behalf of Garcia-Contreras and a motion to withdraw as counsel in his own behalf. Along with the motion to withdraw was a proposed order granting the motion that was prepared by McAtee and signed by Garcia-Contreras.

On May 2, 2022, the court entered an order granting leave for Garcia-Contreras to proceed in forma pauperis on appeal and signed the proposed order granting McAtee's withdrawal. The order granting leave to proceed in forma pauperis was file stamped at 10:44 a.m., and the order granting McAtee's motion to withdraw was file stamped 1 minute later at 10:45 a.m. On May 3, the court entered an order appointing the Douglas County public defender's office to prosecute Garcia-Contreras' appeal. The record suggests that the public defender's office handled Garcia-Contreras' appeal from that point on without any additional involvement by McAtee. However, McAtee remains certified as counsel of record on appeal to this court. The clerk of the district court filed a certificate of appeal on April 28 and an amended certificate of appeal on May 2, both of which list McAtee as the counsel of record for Garcia-Contreras.

The State argues that Garcia-Contreras' ineffective assistance claims are premature and should not be addressed because McAtee is listed as counsel of record on appeal and has failed to properly withdraw in this court. Garcia-Contreras, on the other hand, argues that McAtee properly withdrew in the district court, as evidenced by the district court's May 2, 2022, order granting McAtee's motion to withdraw. As such, Garcia-Contreras argues that McAtee's certification was erroneous and should not prevent review of his ineffective assistance of counsel claims.

The Nebraska Supreme Court addressed a similar scenario in *State v. Parnell, supra*. The court recognized a "substantive component" to the appellate rules governing counsel of record in the context of ineffective assistance of counsel claims, as

- 669 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
STATE v. GARCIA-CONTRERAS
Cite as 31 Neb. App. 657

they enable appellate courts to easily distinguish trial counsel from appellate counsel. *Id.* at 579, 883 N.W.2d at 672. The court further noted that appellate review of ineffectiveness claims can be "frustrated or unnecessarily complicated" when the rules regarding counsel of record are not "strictly followed." *Id.* The present case illustrates that point.

Neb. Ct. R. App. P. § 2-101(F)(2) (rev. 2022) provides, in pertinent part, that attorneys of record in the court below shall be deemed the attorneys of the same parties in the appellate court, as certified to the appellate court by the trial court, until a motion for withdrawal has been filed and granted by the appellate court. Neb. Ct. R. App. P. § 2-106(F) (rev. 2022) then provides the manner for filing a motion to withdraw in the appellate court.

In this case, Garcia-Contreras' appeal was perfected at 10:44 a.m. on May 2, 2022, when the district court granted him leave to proceed in forma pauperis. See § 2-101(A)(1). Yet, McAtee was not formally granted permission to withdraw from the district court until 1 minute later at 10:45 a.m. on May 2. Thus, it appears that McAtee technically failed to withdraw prior to perfection of the appeal, and he was thus required to promptly withdraw in the appellate court. See *State v. Parnell*, 294 Neb. 551, 580, 883 N.W.2d 652, 673 (2016) ("[i]f new counsel has been appointed for an appeal but the former counsel has not withdrawn before an appeal is perfected, the former counsel must promptly withdraw in the appellate court").

Assuming for the sake of argument that the court's order granting withdrawal was timely and effective, then Garcia-Contreras would be correct that it was error for the district court to certify McAtee as counsel of record on appeal. Even in that case, it was incumbent upon McAtee to heed notices from this court and promptly resolve his status by either (1) ensuring a corrected certificate of appeal is transmitted from the trial court or (2) filing a proper request to withdraw as counsel in this court. See *State v. Parnell, supra*. Having failed to do so, McAtee technically remains counsel

- 670 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
STATE v. GARCIA-CONTRERAS
Cite as 31 Neb. App. 657

of record on appeal, and, generally speaking, claims of ineffective assistance of counsel raised on direct appeal by the same counsel who represented the defendant at trial are premature and will not be addressed on direct appeal. *Id.* However, the *Parnell* court carved out an exception that is controlling in the present case.

Despite the fact that the appellant in *Parnell* was "technically" represented by trial counsel on appeal, the court went on to address the merits of the ineffectiveness claims because it was apparent that (1) the appellant was aware of his claims and capable of raising them through his new counsel on appeal and (2) trial counsel was not involved in the appeal. 294 Neb. at 583, 883 N.W.2d at 675. The court concluded that delaying review of the appellant's claims on direct appeal would not serve the purpose of postconviction review under those circumstances.

Although the *Parnell* court issued an order to show cause regarding trial counsel's involvement in the appeal prior to addressing the merits, we find that unnecessary in the present case. All indications are that Garcia-Contreras is being exclusively represented by the public defender's office on appeal. The public defender's office was appointed the day immediately after perfection of the appeal, and McAtee's name is not listed on Garcia-Contreras' appellate brief or reply brief. As in *Parnell*, there are no other filings in this court suggesting that McAtee played any role as counsel for Garcia-Contreras on appeal. While McAtee initially filed the appeal on Garcia-Contreras' behalf, he immediately requested leave to withdraw as counsel along with Garcia-Contreras' express consent to that request. Thereafter, it appears that McAtee attempted and failed to properly request permission to withdraw in this court. We find it apparent that McAtee was not substantively involved in Garcia-Contreras' appeal. Moreover, Garcia-Contreras' brief on appeal demonstrates that he is aware of and capable of raising his claims through new counsel on appeal.

- 671 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
STATE v. GARCIA-CONTRERAS
Cite as 31 Neb. App. 657

Altogether, we reiterate the admonition by the court in *State v. Parnell*, 294 Neb. 551, 883 N.W.2d 652 (2016), that the appellate court rules shall be strictly followed. We likewise urge attorneys to be mindful of notices from the appellate courts and to take prompt actions to resolve any apparent concerns. However, we also conclude that, like in *Parnell*, delaying review of the ineffectiveness claims at hand under the circumstances of this case would not serve the purpose of postconviction review. Therefore, we turn to the merits of those claims.

[7-9] To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense. *State v. Parnell, supra.* To show deficient performance, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.*

Garcia-Contreras first claims that trial counsel was ineffective for failing to preserve a ruling on a pretrial motion in a manner that "directly harmed [Garcia-Contreras'] right to a speedy trial" under Neb. Rev. Stat. § 29-1207 (Reissue 2016). Brief for appellant at 21-22. Specifically, Garcia-Contreras points to a motion for deposition filed by trial counsel on March 2, 2020, which motion operated to toll the statutory speedy trial clock until its final disposition under § 29-1207(4)(a). However, the record is devoid of an order memorializing whether or when the court ruled on that motion.

On March 4, 2020, the court entered an order setting a pretrial conference, but there was no mention of a pending motion for deposition. Thereafter, on May 11, the court entered an order continuing that pretrial conference on the

- 672 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
STATE v. GARCIA-CONTRERAS
Cite as 31 Neb. App. 657

motion of Garcia-Contreras. In that order, the court specifically noted that Garcia-Contreras' motion to continue operated to toll the speedy trial clock under § 29-1207(4)(b), yet there was again no mention of a pending motion for deposition or any other speedy trial concerns. There is nothing in the record before us which would show the district court ever ruled on that motion for deposition. In any case, even if we assume that trial counsel may have been ineffective for failing to secure such a record of that ruling, Garcia-Contreras cannot show prejudice.

Garcia-Contreras argues that "[b]ut for trial counsel's inaction in obtaining an order ruling on his initial motion for deposition, [the] speedy trial clock would not have been suspended until his trial in February 2022." Brief for appellant at 23. In other words, if there was a proper record of the court's ruling on the motion for deposition, then that motion would not have tolled the speedy trial clock indefinitely as Garcia-Contreras claims. This may be true, but it does not create a reasonable probability of a different outcome. The different outcome contemplated by Garcia-Contreras' claim is dismissal of the second amended information on speedy trial grounds, and the fact that a period of time is not excluded for speedy trial purposes does not, in and of itself, create a reasonable probability of a speedy trial violation.

Rather, the ultimate question is whether there was a reasonable probability that the charges against Garcia-Contreras would have been dismissed on speedy trial grounds if counsel had ensured a proper record of the court's ruling on the motion for deposition. Yet, Garcia-Contreras "does not argue" the merits of the speedy trial claim on appeal and points only to the "lack of reasonable 'professional norms' taken by trial counsel prior to the start of trial to ensure that [Garcia-Contreras] was brought to trial at a reasonable time." Brief for appellant at 22.

Even assuming that trial counsel's performance was deficient, Garcia-Contreras cannot show prejudice without a

- 673 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
STATE v. GARCIA-CONTRERAS
Cite as 31 Neb. App. 657

reasonable probability that but for trial counsel's failure to make a record of the order at issue, the record would have revealed a speedy trial violation. There was no mention of a speedy trial violation before the district court, and neither party makes any such argument on appeal. Under these circumstances, we conclude that Garcia-Contreras cannot show prejudice and that his first ineffectiveness claim is affirmatively refuted by the record.

Garcia-Contreras next claims that trial counsel was ineffective for failing to move for a mistrial when Garcia-Contreras tested positive for COVID-19 and was thus prevented from appearing in person for the third day of trial. On February 10, 2022, the district court convened for the third and final day of trial. The State had finished calling witnesses the day prior but decided to wait until that morning to rest its case. Prior to resuming trial, the court was informed that Garcia-Contreras tested positive for COVID-19 and thus could not be transported from jail.

The court stated on the record that it had discussed the matter with counsel and proposed one of two options: "the Court could grant a continuance until such time as . . . Garcia-Contreras was able to come to court safely. . . . Or the Court would allow . . . Garcia-Contreras to appear by [videoconferencing] if he chose to do so." Trial counsel advised the court that he had conferred with Garcia-Contreras and that Garcia-Contreras intended to proceed by videoconferencing. The court then confirmed that the decision to proceed was made freely and voluntarily through a colloquy with Garcia-Contreras himself. Trial resumed, and the State promptly rested its case. Trial counsel made a motion for directed verdict, which the court denied, at which point the defense rested and the court heard closing arguments.

Garcia-Contreras appeared in person for the first 2 days of trial, during which the entirety of the evidence was adduced. When Garcia-Contreras tested positive for COVID-19, the court made clear that it would either continue the matter

- 674 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
STATE v. GARCIA-CONTRERAS
Cite as 31 Neb. App. 657

or proceed by videoconferencing at Garcia-Contreras' election. Garcia-Contreras elected to proceed by videoconferencing, and the court confirmed that that decision was made freely and voluntarily. No further evidence was adduced, and the matter was submitted after closing arguments. Under the circumstances of this case, trial counsel's failure to move for a mistrial was not deficient performance, and Garcia-Contreras could not demonstrate prejudice even if it was. Accordingly, Garcia-Contreras' second ineffectiveness claim is also affirmatively refuted by the record.

## CONCLUSION

For the foregoing reasons, we affirm Garcia-Contreras' convictions and sentences. We further conclude that both of Garcia-Contreras' ineffectiveness claims are affirmatively refuted by the record.

AFFIRMED.