IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. IRATUKUNDA

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

NURU P. IRATUKUNDA, APPELLANT.

Filed November 7, 2023.    No. A-22-973.

Appeal from the District Court for Douglas County: SHELLY R. STRATMAN, Judge. Affirmed.

Benjamin Lee Bramblett for appellant.

Michael T. Hilgers, Attorney General, and Teryn Blessin for appellee.

PIRTLE, Chief Judge, and MOORE and RIEDMANN, Judges.

PIRTLE, Chief Judge.

## I. INTRODUCTION

Nuru P. Iratukunda appeals his convictions in the district court for Douglas County for three counts of first degree sexual assault of a child. He challenges the district court's rulings on motions in limine, whether the evidence was sufficient to convict him, and whether his trial counsel was effective in representing him. Based on the reasons that follow, we affirm.

## II. BACKGROUND

In February 2022, the State filed an amended information charging Iratukunda, who was 23 years old, with three counts of sexual assault of a child in the third degree, Class IB felonies, all of which occurred between May 24, 2019, and May 23, 2020. The victim, V.U., was Iratukunda's minor cousin and was living with Iratukunda and his family at the time of the assaults. The State subsequently filed two motions in limine, one of which included a notice of intent to

offer evidence pursuant to Neb. Evid. R. 404(2) (admissibility of "other acts" evidence), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2022). The trial court granted both motions.

A jury trial was held in February and March 2022. The evidence showed that when V.U. was 10 years old, her mother had her move to Omaha from Idaho to live with Neema Samira. Samira's mother and V.U.'s grandmother are sisters. Samira's two children, Queen and Iratukunda, lived in the home. When V.U. first came to live with Samira, Samira's friend and her two children were also living in the home. They moved out in February 2020 and Iratukunda's girlfriend, Pauline Lino, also known as Hope, moved into the home. V.U. was 12 years old at the time of the trial.

Deborah Heckman, a resource paraprofessional at V.U.'s school, testified that she worked with V.U. at school and developed a close relationship with her. V.U. trusted Heckman and would confide in her. In early February 2021, Heckman called child protective services (CPS) after V.U. sent an email to her with a picture of V.U. crying and the reason why she was crying. Heckman testified that V.U. told her in an email exchange that Iratukunda had pulled her hair and/or beat her up. Heckman subsequently called CPS. Previously there had been other calls made to CPS by other adults at the school regarding physical abuse of V.U.

On February 24, 2021, V.U. was removed from her home because of physical abuse and was initially placed with Heckman. After a couple days, Heckman noticed a change in V.U.'s behavior when she was around Heckman's husband. She asked V.U. if someone had touched her inappropriately and V.U. told her Iratukunda had touched her. Heckman did not ask her anything further. She called CPS and was told to bring V.U. to Project Harmony. V.U. was subsequently placed with someone else.

Heckman testified that on April 5, 2021, her husband received text messages on his phone addressed to Heckman. The first message indicated that Heckman was falsely accusing "that young boy." Heckman responded to the message, asking "Who are you talking about?" The response was "Nuru, that boy [you] accused of rape." Heckman testified that based on the response, she had no doubt that someone from Iratukunda's family was sending the messages. There was another text message she felt was threatening toward her and her family, and another one that stated she "won't have peace." The sender of the messages did not identify himself or herself and Heckman admitted she did not know who sent the texts, but knew it was not Iratukunda because he was incarcerated at the time. The State offered the text messages as evidence and Iratukunda objected based on foundation. The court overruled the objection.

V.U. testified and described the sexual abuse she experienced from Iratukunda. She first testified about one specific incident that occurred in Iratukunda's bedroom on his bed. She testified that Iratukunda told her to pull her pants down and she did because she did not know what to expect and she did not want to get a "whooping." She said her shirt was on, but her pants were either pulled down or all the way off, and she thought Iratukunda had his clothes off. V.U. testified that when Iratukunda put his hand in her vagina he asked her how it felt, and she told him that it hurt. After Iratukunda removed his hand, he asked V.U. if she wanted to have sex and she told him "No." Iratukunda then told her to stand up and pull up her pants, which she did. He then told her to open her mouth and he pulled down his underwear and put his penis in her mouth. Iratukunda was not wearing a shirt and his pants were all the way off. He said something to her that she could not recall and then told her she could leave. V.U. testified that when she left, she felt "weirded

out" and confused. She stood outside the door for a minute thinking about what had just happened and then went to get her toothbrush and brushed her teeth. V.U. stated that this was the only time he put his penis in her mouth.

She also testified that on the same day he put his penis in her mouth, Iratukunda put his penis in her vagina. She was laying on her back on his bed. Her shirt was on, but her pants were off. She believed all Iratukunda's clothes were off. He told her to spread her legs and she did as he asked because she was afraid he would physically abuse her. She testified that when he put his penis in her vagina it felt weird, and it hurt. She stated she was relieved when it was over.

V.U. testified that Iratukunda touched the inside of her vagina with his hand more than once. She testified that on another occasion the two of them were in the bathroom when Iratukunda put his hand inside her vagina. She explained that the two of them were in the bathroom because Iratukunda told her he was going to give her a shower because he did not believe she had already taken one. Iratukunda said he was going to wash her because she was not doing it right. While he was washing her, he touched the inside of her vagina. Iratukunda told her not to tell anyone about what he had done.

V.U. also testified that Iratukunda made her read her diary in front of Samira, Queen, and Hope and she had written in there that Iratukunda had touched her. No one took any action following her disclosure. V.U. also stated that she told Samira that Iratukunda had touched her, but she did not do anything about it. V.U. eventually told Heckman about the touching when she was living with her.

Detective Juan Jimenez of the Omaha Police Department testified that V.U. was brought into Project Harmony for a forensic interview based on allegations of physical and sexual abuse. He observed the forensic interview, during which V.U. disclosed physical and sexual abuse by Iratukunda.

Jimenez subsequently interviewed Iratukunda at the police station and Iratukunda corroborated V.U.'s allegations regarding physical abuse or discipline. He denied any sexual abuse had occurred. At the end of the interview Iratukunda was arrested.

Janessa Michaelis performed the forensic interview of V.U. at Project Harmony. She testified about the forensic interview process in general and then V.U.'s recorded interview was played for the jury. In the interview, V.U. revealed sexual abuse by Iratukunda consistent with her testimony at trial. Michaelis testified that she did not have any concerns about V.U.'s suggestibility or coaching during the interview because of the additional details V.U. provided beyond just disclosing the sexual abuse.

Jessica Tippery, a nurse practitioner at Project Harmony, performed a forensic exam on V.U. after the forensic interview. She testified that prior to the exam, Michaelis informed Tippery that V.U. had disclosed physical and sexual abuse by Iratukunda over the past year. Tippery then talked to V.U. before doing the exam and V.U. disclosed that Iratukunda had hit her on her shoulder, upper arm, legs, back, and butt and sometimes hit her with a belt, a stick, or toys. V.U. also told Tippery that when she would get in trouble, Iratukunda would make her kneel with her arms above her head.

V.U. also disclosed to Tippery that Iratukunda had touched the inside of her vaginal area with his hand more than once. When asked how it made her feel she said "disgusted" and said that it hurt. V.U. also told Tippery that Iratukunda put his penis inside her vagina on one occasion. It

made her feel "disgusted, grossed out, and uncomfortable." She further revealed that Iratukunda put his penis in her mouth one time. She stated that this all occurred when she was 10 years old. Tippery testified that V.U.'s account of what had happened was consistent with the information reported to her by Michaelis. During the physical exam, she did not find any injuries, but did not expect to find any based on the information she had at the time. V.U. declined an exam of her genital area, which is not uncommon for children to do.

Several witnesses testified on Iratukunda's behalf. Iratukunda's girlfriend, Hope, testified that in 2019, she stayed overnight at Samira's home some of the time. In February 2020, she moved into Samira's home. She helped take care of V.U. when Samira was at work. She made sure V.U. went to school and was home when V.U. returned after school. Hope also made sure V.U. did her homework and went to bed on time.

Hope testified that Iratukunda worked Monday through Friday from 3:30 p.m. to 11 p.m., and in early 2020 he started a second job working 5 a.m. to 5 p.m. Friday through Sunday. He was also taking college courses. The only time Iratukunda and V.U. were home at the same time was Mondays, Wednesdays, and Thursdays from 8 a.m. until 2:45 p.m. during the COVID-19 pandemic when V.U. was going to school online. Hope testified she was also home during that time. When Iratukunda had only one job in 2019, he was also home on Saturdays and Sundays. Hope did not know if Iratukunda was ever alone with V.U. before she moved into Samira's home. Hope stated she saw Iratukunda punish V.U. on two occasions by making her kneel with her hands up in the air.

Samira testified V.U. came to live with her on August 29, 2019, and was removed on February 23, 2021. When V.U. first moved in, Samira was working 7 a.m. to 3 p.m. Samira lost her job in February 2020 and was unemployed until November 2020. When she started working again, her hours were the same as they had previously been. In April 2021 her hours changed, and she was working from 1:30 p.m. to midnight, Thursday through Sunday.

Samira testified that V.U. was never alone with Iratukunda and he never took care of V.U. when she was at work. Samira did not know why Iratukunda would have told police he took care of V.U.

Samira remembered V.U. reading her diary out loud but testified there was nothing she read that concerned her. V.U. never told her that Iratukunda had abused her or touched her inappropriately. She stated that Iratukunda was the only one in the house who had his own bedroom.

Iratukunda also testified at trial. He recalled V.U. reading her diary in front of Samira, Queen, Hope, and himself. He claimed V.U. left her diary on the kitchen table and he read it. When everyone came to the table for breakfast, he asked her to read it for everyone. He did not punish V.U. for what she wrote in the diary, and they did not discuss it.

He denied ever touching V.U. inappropriately, giving her a shower, or penetrating any part of her body with his hand or penis. Iratukunda admitted that if V.U. did something wrong at home he would punish her by making her kneel and raise her hands up for 2 or 3 minutes.

He testified that he never took care of V.U. by himself or when no one else was home. Iratukunda testified that the reason he told police he helped "take care" of V.U. when Samira was at work was because he would help out while others were also home but did not take care of V.U.

by himself. He also denied telling Jimenez that he was alone with V.U. in his bedroom at some point.

The State called Jimenez as a rebuttal witness and a clip from Iratukunda's police interview was played for the jury. In the interview Iratukunda said he looked after V.U. while his mom was at work and that she worked from 1 p.m. to 11 p.m. He did not indicate that he did not take care of V.U. by himself.

Following trial, the jury found Iratukunda guilty on all three counts and the trial court entered judgment accordingly. The trial court subsequently sentenced Iratukunda to 30 to 50 years' imprisonment on each count with the sentences to run concurrently.

On April 25, 2022, Iratukunda's newly retained counsel filed a motion for new trial. The court entered an order denying Iratukunda's motion for being untimely filed. On December 13, the court entered an order granting Iratukunda's motion for postconviction relief on the ground that trial counsel and subsequent counsel failed to timely file a motion for new trial and failed to perfect an appeal during the required time. Accordingly, Iratukunda was permitted to file a direct appeal, which is the appeal before us now.

## III. ASSIGNMENTS OF ERROR

Restated, Iratukunda assigns that the trial court erred in (1) failing to overrule the State's two motions in limine and (2) finding that the evidence was sufficient to convict him. Iratukunda also alleges that his trial counsel was ineffective in the following ways: (1) failing to object to the State's comments and line of questioning during voir dire, and his counsel's subsequent use of the line of questioning was deficient and prejudicial, (2) failing to object to the admissibility of Heckman's testimony regarding an email V.U. sent to her, as well as statements related to the physical abuse of V.U., (3) failing to object to the admissibility of the text messages Heckman received on grounds other than foundation, and (4) failing to object to the State's improper impeachment of Samira.

## IV. STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Miller*, 312 Neb. 17, 978 N.W.2d 19 (2022). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. *State v. Warner*, 312 Neb. 116, 977 N.W.2d 904 (2022). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. STATE'S MOTIONS IN LIMINE

Iratukunda first assigns the trial court erred in failing to overrule the State's two motions in limine. As assigned, there is nothing for this court to review. An appellant who has assigned only that the trial court erred in denying a motion in limine has not triggered appellate review of the evidentiary ruling at trial. *State v. Ferrin*, 305 Neb. 762, 942 N.W.2d 404 (2020). Iratukunda's assignment of error challenges only the ruling on the motion in limine and, therefore, it presents nothing for appellate review. See *id.*

### 2. SUFFICIENCY OF EVIDENCE

Iratukunda assigns that the trial court erred in finding that the evidence was sufficient to convict him of three counts of first degree sexual assault of a child. He argues that V.U.'s testimony was not credible, there was no physical evidence, and the State's remaining evidence consisted of Project Harmony employees' accounts of V.U.'s disclosure of who her assailant was.

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Miller*, 312 Neb. 17, 978 N.W.2d 19 (2022). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

In a criminal case, the evidence upon which a jury may rely in making its findings may be direct, circumstantial, or a combination thereof. *State v. Escamilla*, 291 Neb. 181, 864 N.W.2d 376 (2015). Circumstantial evidence is not inherently less probative than direct evidence. In finding a defendant guilty beyond a reasonable doubt, a fact finder may rely upon circumstantial evidence and the inferences that may be drawn therefrom. *Id.*

A person commits the offense of sexual assault of a child in the first degree when he or she subjects another person under 12 years of age to sexual penetration and the actor is at least 19 years of age or older. Neb. Rev. Stat. § 28-319.01(1)(a) (Reissue 2016). Sexual penetration means sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical, nonhealthy, or nonlaw enforcement purposes. Neb. Rev. Stat. § 28-318(6) (Cum. Supp. 2022). The slightest intrusion into the genital opening is sufficient to constitute penetration, and such element may be proved by either direct or circumstantial evidence. *State v. Garcia-Contreras*, 31 Neb. App. 657, 987 N.W.2d 641 (2023).

At trial, the State established that V.U. was born in May 2009, making her 10 and/or 11 years old at the time of the offenses. V.U. also told Michaelis and Tippery that she was 10 years old when the sexual abuse occurred. Iratukunda was born in December 1998, making him over the age of 19 at the time of the offenses.

V.U. testified that Iratukunda penetrated her vagina with his hand on more than one occasion, with his penis once, and penetrated her mouth with his penis once. Iratukunda contends

that V.U.'s testimony was not credible. However, that was for the jury to decide. An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Miller, supra*.

If believed, V.U.'s testimony alone was sufficient for a conviction. See *State v. Anders*, 311 Neb. 958, 977 N.W.2d 234 (2022) (since 1989, the State has not been required to corroborate victim's testimony in cases of first degree sexual assault; if believed by finder of fact, victim's testimony alone is sufficient.)

However, for the sake of completeness, in addition to V.U.'s testimony, there was testimony from other witnesses that showed her account of the sexual abuse remained consistent. In her forensic interview, V.U. told Michaelis about the sexual abuse by Iratukunda and it was consistent with her testimony at trial. Michaelis testified that she did not have any concerns about V.U.'s suggestibility or coaching because of the additional details V.U. was able to provide beyond just disclosing the sexual abuse. Tippery also testified that what V.U. reported to her during the forensic exam was consistent with the information Michaelis had given her following the forensic interview. Tippery further testified that V.U. told her Iratukunda had penetrated her vagina with his hand and penis and penetrated her mouth with his penis. Accordingly, there was sufficient evidence that Iratukunda subjected V.U. to sexual penetration during the date range alleged.

Viewing the evidence in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of first degree sexual assault of a child beyond a reasonable doubt. See *State v. Miller*, 312 Neb. 17, 978 N.W.2d 19 (2022). Thus, the trial court did not err in accepting the jury's guilty verdicts on three counts of first degree sexual assault of a child. This assignment of error fails.

### 3. Ineffective Assistance of Counsel

Iratukunda's remaining assignments of error allege that his trial counsel provided ineffective assistance. When, as here, a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Warner*, 312 Neb. 116, 977 N.W.2d 904 (2022). The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id.* The determining factor is whether the record is sufficient to adequately review the question. *Id.*

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient, and that this deficient performance actually prejudiced the defendant's defense. *State v. John*, 310 Neb. 958, 969 N.W.2d 894 (2022). To show that counsel's performance was deficient, the defendant must show counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area. *Id.* To show prejudice under the prejudice component of the *Strickland* test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. *State v. John, supra.* A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome. *Id.* The two

prongs of this test may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable. *Id.*

An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *Id.*

Therefore, in reviewing Iratukunda's claims of ineffective assistance of counsel on direct appeal, we decide only whether the undisputed facts contained in the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. See *State v. John, supra.*

(a) Failure to Object to State's Improper
Comments During Voir Dire

Iratukunda first argues that his trial counsel was ineffective for failing to object to alleged improper and prejudicial comments made by the State during voir dire, and subsequently using the same line of questioning during voir dire.

During the State's voir dire, there was an exchange with a prospective juror about differences in cultural norms. The following exchange took place:

[STATE'S COUNSEL]: . . . Can you think of some reasons maybe why – what might make someone more susceptible to being a victim? . . . .

[PROSPECTIVE JUROR]: I also think that there are some cultural norms that – thank you, I – I think those of us that are in education know that there are some cultural norms where there are some age boundaries that get crossed – that are very hush-hush within certain cultural communities. That do get – do or do not get reported. I think that's – that's become kind of a big issue.

[STATE'S COUNSEL]: Sure. And do you think that because there may be cultural differences that there's still a law in Nebraska that it should be prosecuted?

[PROSPECTIVE JUROR]: It absolutely should be prosecuted, yes.

. . . .

[STATE'S COUNSEL]: Sure. Does anyone here disagree? Does anyone think because maybe it's culturally normal or normal for that individual, that that should be a reason to not prosecute a case? Okay, I'm seeing headshakes, no. All right.

During defense counsel's voir dire, he returned to the cultural norms discussion and the following exchange took place:

[IRATUKUNDA'S COUNSEL]: . . . I think there was a question about cultural norms. I mean, I guess I don't – I think, ma'am, you are the one who talked about cultural norms.

. . . .

[IRATUKUNDA'S COUNSEL]: I didn't quite understand what you meant by their cultural norms.

. . . .

[PROSPECTIVE JUROR]: Okay. So with some of my experience with certain cultures that are – certain refugee cultures that have come to the United States, there are some cultural norms that have had to be kind of explained that certain – that there are laws regarding ages of consent or ages of marriage and sexual acts.

I know that at a school that I used to work at in the past – Indian Hill – we had to have a police agency come in. This was at least ten years ago – and explain that the laws of only one husband one wife legally and that young – younger girls under the age of 18 could not marry – could not get married. So those are just some of the cultural norms that I've experienced in my career that we've had to discuss and also turn in to authorities because they're not being legally sound.

[IRATUKUNDA'S COUNSEL]: So are you saying that the fact that my client is a refugee that this should be held to a different norm?

[PROSPECTIVE JUROR]: No – absolutely not. It's the actual opposite. That no matter what you have come from and whatever – we're a melting pot, and wherever you've come from, the law is the law here in the United States. But it has had to be explained to some of my families that we've – that I've – I've had in classrooms in the past.

[IRATUKUNDA'S COUNSEL]: Would there [sic] anybody here who would have a problem trying to apply those kind of cultural norms and saying, well, [Iratukunda], he did this because of his culture. Is there anybody who's going to feel that's the way it should be treated or not?

[PROSPECTIVE JUROR]: I – I hope that your understanding that I'm saying that the law is the law here in the United States, no matter where you have come from, but the law is the law regardless of where you've come from. So that's what I'm stating is that the cultural norms that have had to be explained to – to several people, several families that I've worked with over the last 28 years of working in – in education.

. . . .

[IRATUKUNDA'S COUNSEL]: -- what you're saying is that you know even in America you have to follow the rules of America. I gotcha.

[PROSPECTIVE JUROR]: Yes, sir.

[IRATUKUNDA'S COUNSEL]: But I'm just wondering if the panel – anyone in the panel thinks that because my client is a refugee or whatever, they – he should be held to a different standard? Nobody thinks that, correct? Okay.

And is there any of you who are potential jurors who will not keep an open mind throughout this trial, which might take a week or less or more. Anybody?

I think that's all I have.

Iratukunda argues that his counsel should have objected to the State's exchange with the potential juror and requested a limiting instruction advising the jury that Iratukunda was not from a culture that practices having sex with children. He further contends that not only did counsel fail to take these actions, but he also engaged in the same line of inquiry during his voir dire. Iratukunda suggests that this line of questioning was prejudicial because the jury could have believed he was a refugee from a primitive culture where sex with children was an acceptable norm.

We conclude that even if Iratukunda's counsel was deficient for failing to object to the State's voir dire and engaging in the same line of questioning, Iratukunda cannot establish prejudice. The prospective juror was the one who initiated the discussion regarding different cultural norms. After her comments about her past experiences in education she made it clear that she believed the laws in the United States should be applied to every person regardless of where he or she is from and that every person should be prosecuted when he or she violates the law. Neither this prospective juror, nor any other prospective juror, spoke about Iratukunda's culture specifically or made any accusations that his culture allowed sex with children. Further, no prospective juror indicated that he or she could not be fair and impartial toward Iratukunda or someone from his culture. All potential jurors agreed that the laws in the United States are the laws that apply regardless of any cultural differences. In addition, the prospective juror that initiated the discussion in question was ultimately not selected for the jury. Therefore, Iratukunda cannot establish that he was prejudiced by counsel's actions or inactions during voir dire. This claim that counsel was ineffective fails.

### (b) Failure to Object to Heckman's Testimony
### Regarding V.U.'s Email and Photo

Iratukunda next argues that his trial counsel was ineffective in failing to object to Heckman's testimony about the email she received from V.U. with a photo of V.U. crying. Heckman testified that she made a report to CPS after receiving an email that included a photo of V.U. "crying with tears streaming down her face and it just said five words." Heckman also testified that in the email exchange that followed, V.U. told her she was crying because Iratukunda had pulled her hair and/or "beat her up."

Iratukunda asserts counsel was ineffective for failing to object to Heckman's testimony about the photo within the email from V.U. because the photo was hearsay within hearsay without an exception, including the excited utterance exception. He also contends that the best evidence rule precluded the testimony without admitting the email or photograph into evidence.

The State asserts that Iratukunda's claim fails because Heckman's testimony was not hearsay, as it was not offered for the truth of the matter asserted--that V.U. was being physically abused. We agree. Before Heckman was asked about the photo from V.U., the State asked her if she knew why V.U. was removed from the home she was living in. Heckman responded V.U. was removed because of physical abuse, adding that there had been a few calls made to CPS by school officials. The State then asked Heckman about the call she made to CPS and Heckman stated that it was "after [V.U.] sent me a picture." The State then asked her about the picture. Heckman's testimony about the email and the photo was offered as context as to why Heckman called CPS and why V.U. was ultimately removed from where she was living and placed with Heckman. Because the testimony in question is admissible, Iratukunda cannot prove that his trial counsel was ineffective in failing to object. This ineffective assistance of counsel claim fails.

### (c) Failure to Object to Admissibility
### of Text Messages Sent to Heckman

Iratukunda next argues that counsel was ineffective for failing to object to the admissibility of the threatening text messages sent to Heckman on grounds other than foundation. He argues the

text messages were not properly authenticated, were not relevant, were prejudicial, and were hearsay. The record does not reflect why defense counsel did not object on any of the grounds Iratukunda claims should have been used. We conclude the record is insufficient to determine this claim on direct appeal, but it is preserved for postconviction purposes.

(d) Failure to Object to State's Improper
Impeachment of Samira

Iratukunda's final ineffective assistance of counsel claim is that his counsel failed to object to the State's improper impeachment of Samira with facts not in evidence. During the cross-examination of Samira, the State asked what hours she worked when she started working again in November 2020. After she answered "7 to 3," she was asked if there was a reason Iratukunda would have said her hours were 1 p.m. to 11 p.m., and she replied, "No." The State also asked Samira if Iratukunda ever took care of V.U. when she was at work and she indicated he did not. The State then asked if it would surprise her to hear that Iratukunda said he did take care of V.U. when she was at work, and she stated that it would surprise her because it never happened. Iratukunda argues that these lines of questioning involved facts that were not in evidence and were used to impeach Samira.

We conclude that even if counsel was deficient in failing to object to the questions asked of Samira, he cannot establish that he was prejudiced by counsel's alleged deficient performance. Although Iratukunda's answers to what hours Samira worked and whether he took care of V.U. when Samira was at work were not in evidence when the State cross-examined Samira, Iratukunda's answers to these questions were received into evidence during the State's rebuttal. A clip of Iratukunda's police interview was played for the jury and Iratukunda stated his mom worked from 1 p.m. to 11 p.m. and that he looked after V.U. when she was at work. Iratukunda was not prejudiced by his counsel's failure to object to the questions asked during the cross-examination of Samira. This claim of ineffective assistance of counsel fails.

VI. CONCLUSION

We conclude that Iratukunda did not preserve his objections to the State's motions in limine for appellate review, and there was sufficient evidence to convict him of three counts of first degree sexual assault of a child. His ineffective assistance of counsel claims fail because he either cannot prove his counsel was deficient or that he was prejudiced by counsel's allegedly deficient performance, or the record is insufficient to address the claim on direct appeal. Accordingly, Iratukunda's convictions and sentences are affirmed.

AFFIRMED.